**[J-47-2014]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**


**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**


| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 677 CAP |
| | : |
| Appellee | : Appeal from the Order entered on |
| | : 01/17/2013 in the Court of Common Pleas, |
| | : Criminal Division of Allegheny County at |
| v. | : Nos. CP-02-CR-0011609-1997, |
| | : CP-02-CR-0012047-1997 and |
| | : CP-02-CR-0013318-1997 |
| WAYNE CORDELL MITCHELL, | : |
| | : SUBMITTED:  April 15, 2014 |
| Appellant | : |


**OPINION**


**MR. JUSTICE STEVENS**                         **DECIDED:    December 16, 2014**

This is a capital appeal from the order of the Court of Common Pleas of Allegheny County denying Appellant Wayne Cordell Mitchell's first petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46.[1]   For the reasons that follow, we affirm.

The facts underlying Appellant's conviction and sentence of death are discussed more fully in this Court's opinion resolving Appellant's direct appeal.   See Commonwealth v. Mitchell, 588 Pa. 19, 902 A.2d 430 (2006), cert. denied, 549 U.S. 1169, 127 S.Ct. 1126, 166 L.Ed.2d 897 (2007) ("Mitchell I").   In order to place Appellant's current collateral claims in context, some background is required.

---

[1] This Court has exclusive jurisdiction of appeals from final orders denying post-conviction relief in death penalty cases.   See id. § 9546(d).

The evidence adduced at trial indicated that Appellant and his estranged wife, Robin Little, had a volatile relationship. On September 1, 1997, Robin went to Appellant's place of employment to borrow his bus pass, and after she arrived, she told Appellant she had engaged in sexual relations with another man. Appellant became angry, dragged Robin into a supervisor's office, and raped her. Robin reported the rape to the police, and she underwent an examination at the Magee Women's Hospital.

While Robin was at the hospital, the police arrested Appellant, and after he waived his Miranda rights,[2] Appellant admitted in a taped statement that he had raped Robin. Police Detective Doug Yuhouse noted that, during the taped statement, Appellant was cooperative and did not appear to be under the influence of alcohol. The police charged Appellant at CC No. 9712047 with rape, terroristic threats, unlawful restraint, and simple assault for the September 1, 1997 attack on Robin. He was arraigned and remained in jail pending a preliminary hearing, which was scheduled for September 9, 1997.

On September 4, 1997, while Appellant was still in jail awaiting his preliminary hearing, Robin filed for a Protection from Abuse ("PFA") order.[3] The court granted the petition entering a ten-day temporary order, which directed Appellant to have no contact with Robin pending a full hearing scheduled for September 10, 1997.

At the September 9, 1997 preliminary hearing on the rape charge, Appellant waived the charges to court in exchange for a nominal bond, with a condition that he seek immediate in-patient treatment for alcohol abuse at St. Francis Hospital. However, for reasons disputed at trial, Appellant was never admitted to the hospital for treatment on

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] See 23 Pa.C.S. §§ 6101-18.

September 9, 1997, as required by the agreement, and instead, he went home and began calling Robin.

During the afternoon of September 9, 1997, at approximately 4:15 p.m., Appellant arrived at Robin's home and the two argued. At 6:00 p.m., Appellant left, and at 1:00 a.m. on September 10, 1997, Appellant telephoned Sheila Britton, the former director of a college-counseling program at the high school where Appellant and Robin attended. Appellant told Ms. Britton he was going to Robin's house to kill her because she had "disrespected" him. Ms. Britton told Appellant to go to sleep. At trial, she testified that, during their conversation, Appellant did not slur any of his words and spoke in coherent sentences.

Appellant later admitted to Detective Dennis Logan that, instead of going to bed, he walked to Robin's house, arriving at 1:30 a.m. Appellant argued with Robin, who was sitting on the front porch, and punched her in the face and stomach, causing her to fall against the door. When she tried to run, Appellant grabbed her and, when she resisted, Appellant dragged her toward an empty lot near her home, continuing to punch her as she tried to break free. At that point, Robin screamed for help, yelling, "He's going to kill me." N.T. 10/5/99, trial, at 383. Appellant put a hand over Robin's mouth and continued to drag her.

As they passed a house, Appellant saw a knife lying on the porch. Appellant punched Robin several times, temporarily disabling her while he returned to the porch to get the knife. When Robin attempted to pull herself up off the ground, Appellant pushed her down and stabbed her in the stomach. He then removed her clothes, wrapped his hands around her neck, and raped her, first vaginally and then anally. When Robin

vomited blood, Appellant wiped her mouth with a rag and continued to rape her. When he finished, he turned her over and stabbed her multiple times in the neck. Appellant threw Robin's clothes, the knife, and the bloody rag into a nearby sewer. Appellant later told Detective Logan he left Robin's body naked because "[i]f she wanted to f--k everybody, now everybody could see her f--king body." N.T. 10/5/99, trial, at 387.

Appellant called Ms. Britton again at 4:00 a.m., and told her, "Robin Little is no more." Id. at 330. At 9:00 a.m., Appellant appeared in court for the PFA hearing; however, when Robin failed to appear, the court dismissed the temporary PFA order. When Appellant returned home, his mother informed him that Robin was found dead, and upon his mother's urging, Appellant decided to go to the emergency room of St. Francis Hospital, where he reported sometime around noon on September 10, 1997.

Meanwhile, at around 10:15 a.m., Robin's naked body was discovered in a backyard close to her home, and the police later discovered Robin's clothes in the sewer. Appellant's clothing was recovered from a vacant house in a nearby neighborhood. As soon as Robin's body was discovered, homicide detectives began looking for Appellant and learned he was being evaluated at the emergency room of St. Francis Hospital. As Appellant was being released from the emergency room at approximately 1:54 p.m., the police approached Appellant in the waiting room and asked him to accompany them to their office. Appellant agreed to do so. During the short ride to the homicide office, Appellant said he had nothing to do with Robin's death, at which point Detective Logan replied he did not want to talk about the case in the car.

At the homicide office, Detective Logan told Appellant he wished to speak to him about Robin's murder, and Appellant was escorted to an interview room where, after

waiving his <u>Miranda</u> rights, Appellant made a full statement to Detective Logan admitting that he raped Robin on September 1, 1997, and that he raped her again and murdered her on September 10, 1997. Detective Logan noted Appellant appeared in full control of his faculties and provided a remarkably detailed account of his turbulent relationship with Robin, as well as a full explanation of how and why he raped her twice and then murdered her.

In addition to the charges at CC No. 9712047, as set forth <u>supra</u>, the police charged Appellant at CC No. 9713318 with rape, involuntary deviate sexual intercourse (IDSI), and unlawful restraint for the September 10, 1997 attack of Robin. Moreover, at CC No. 9711609, the police charged Appellant with one count of criminal homicide for the September 10, 1997 strangulation and stabbing death of Robin. The Commonwealth filed and served a timely notice of its intention to seek imposition of the death penalty.

Appellant filed several pre-trial motions, which the trial court denied. On October 1, 1999, Appellant pleaded guilty to the charges arising from the September 10, 1997 sexual assault at CC No. 9713318. The court deferred imposition of sentence until after trial on the remaining charges, which commenced before a jury on October 4, 1999. At trial, the Commonwealth presented evidence from a number of witnesses, including Robin's mother, Robin's sister-in-law, Ms. Britton, several police officers, the doctor who examined Robin after the first rape, and the chief forensic pathologist from the coroner's office.

Although Appellant declined to testify, he presented testimony from several witnesses, including his uncle,[4] Attorney Rosalyn Guy-McCorkle (Appellant's former defense attorney),[5] and Dr. Lawson Bernstein (a forensic neuropsychiatrist).[6] Appellant called these witnesses to support his diminished capacity defense that, due to his psychological condition and long-term alcohol abuse, he was unable to form the requisite specific intent to kill for a murder conviction.

At the close of the trial, the jury rejected Appellant's defense and found him guilty of first-degree murder for the September 10, 1997 death of Robin at CC No. 9711609, as well as the remaining charges of rape, unlawful restraint, and simple assault arising from the September 1, 1997 incident at CC No. 9712047. Accordingly, as the Commonwealth was seeking the death penalty, the jury remained empanelled for a separate penalty-phase hearing. On October 13, 1999, after hearing additional testimony, the same jury unanimously found two aggravating circumstances: Appellant committed the

---

[4] Appellant's uncle, Curtis Mitchell, claimed Appellant was at his house between 8:00 and 8:30 p.m. on September 9, 1997, and Appellant consumed alcohol while at the house.

[5] Attorney Guy-McCorkle testified to meetings she had with Appellant on September 9, 1997, September 10, 1997, and September 11, 1997. She described Appellant as not being coherent on September 9, 1997, tired on September 10, 1997, and confused on September 11, 1997.

[6] Dr. Bernstein opined Appellant suffered from a number of different psychiatric conditions, including alcohol abuse and dependence, alcoholic hallucinosis, and depression, which diminished Appellant's capacity to premeditate, deliberate, and form specific homicidal intent and be fully conscious of that intent. N.T. 10/5/99, trial, at 556-57. In forming his opinions, Dr. Bernstein explained he examined Appellant, reviewed Appellant's pediatric medical records, and reviewed Appellant's records from St. Francis Hospital, where Appellant had been twice admitted prior to the murder, once in April of 1992 and again in May of 1992, when he was fourteen years old. Dr. Bernstein also examined the St. Francis Hospital emergency room records from the day of the murder, interviewed Appellant's mother, and arranged for Appellant to undergo a brain MRI and EEG test, the results of which for both turned out to be normal.

killing while in the perpetration of a felony (rape) and Appellant was subject to a PFA order restricting his contact with the victim when he killed her.[7] The jury found no mitigating circumstances. Consequently, the jury sentenced Appellant to death.

On December 8, 1999, the trial court imposed a sentence of death for the first-degree murder conviction and a consecutive aggregate of twelve years to twenty-seven years in prison for the remaining charges at CC No. 9712047. After Appellant unsuccessfully sought to withdraw his guilty plea at CC No. 9713318, on February 10, 2000, the trial court sentenced Appellant to eight years to twenty years in prison for the September 10, 1997 rape to be served consecutively to both the death sentence and the sentence imposed for the September 1, 1997 rape and related offenses. The trial court imposed no further penalty for the remaining counts. On direct appeal, this Court affirmed Appellant's judgments of sentence. See Mitchell I, supra.

On February 21, 2007, Appellant filed a timely pro se PCRA petition,[8] and collateral review was assigned to the Honorable Randal B. Todd. Members of the Federal Community Defender Office for the Eastern District of Pennsylvania ("FCDO") subsequently entered an appearance on behalf of Appellant and filed a court-ordered amended PCRA petition raising thirteen claims. The Commonwealth filed its answer, and a five-day hearing was held in October of 2012, at which numerous witnesses testified. The PCRA court ultimately denied relief. Still represented by the FCDO, Appellant filed a counseled appeal and concise statement of errors complained of on

---

[7] 42 Pa.C.S. §§ 9711(d)(6) and (d)(18), respectively.

[8] Appellant's judgments of sentence became final on January 16, 2007, the date the United States Supreme Court denied certiorari. Accordingly, Appellant's pro se PCRA petition, which was filed on February 21, 2007, was timely filed pursuant to 42 Pa.C.S. § 9545(b)(1).

appeal, see Pa.R.A.P. 1925(b), and the PCRA court issued an opinion addressing each of the alleged errors and concluding that it had properly denied relief. See Commonwealth v. Mitchell, CC Nos. 1997-11609, 12047, 13318, slip op. at 33 (C.P. Allegheny, July 31, 2013) ("PCRA Court Opinion").

In reviewing the denial of PCRA relief, we examine whether "the PCRA court's determinations are supported by the record and are free of legal error." Commonwealth v. Robinson, ___ Pa. ___, ___, 82 A.3d 998, 1005 (2013) (quotation and quotation marks omitted). See Commonwealth v. Strong, 563 Pa. 455, 461 n.3, 761 A.2d 1167, 1170 n.3 (2000) ("Since most PCRA appeals involve…issues raising mixed questions of fact and law, our standard of review is whether the findings of the PCRA court are supported by the record and free of legal error.") (citations omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a de novo standard of review to the PCRA court's legal conclusions." Commonwealth v. Roney, ___ Pa. ___, ___, 79 A.3d 595, 603 (2013) (citation omitted).

To be entitled to PCRA relief, Appellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the circumstances enumerated in 42 Pa.C.S. § 9543(a)(2), and that the allegation of error has not been previously litigated or waived. See Commonwealth v. Sneed, 616 Pa. 1, 45 A.3d 1096 (2012). For present purposes, the circumstances that would warrant relief are a constitutional violation, or ineffective assistance of counsel, which so undermined the reliability of the truth determining process that no reliable adjudication of guilt or innocence could have taken place. See id.; 42 Pa.C.S. § 9543(a)(2).

With regard to ineffective assistance of counsel claims, the test we utilize in Pennsylvania is substantively the same as the performance-and-prejudice standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), although this Court has divided the performance component into sub-parts dealing with arguable merit and reasonable strategy. Appellant must, therefore, show that: the underlying legal claim has arguable merit; counsel had no reasonable basis for his act or omission; and Appellant suffered prejudice as a result. See Commonwealth v. Pierce, 515 Pa. 153, 158-60, 527 A.2d 973, 975-76 (1987). Because all three prongs must be demonstrated, the ineffectiveness claim fails if any one of them is not proved. See Commonwealth v. Busanet, 618 Pa. 1, ___, 54 A.3d 35, 45 (2012), cert. denied, ___ U.S. ___, 134 S.Ct. 178, 187 L.Ed.2d 122 (2013).

Moreover, we note that Appellant's direct appeal was pending at the time we decided Commonwealth v. Grant, 572 Pa. 48, 813 A.2d 726 (2002), which held that claims of ineffective assistance of counsel should be deferred until collateral review. Appellant raised several claims of ineffective assistance of counsel on direct appeal and, applying Grant retroactively, we declined to address the claims with no prejudice to Appellant's right to raise them on collateral review. See Mitchell I, supra. Since Grant is applicable to this case, Appellant need not present his ineffectiveness claims as "layered" claims. See Roney, supra. With this framework in mind, we now address Appellant's claims.

**Claim I**

In his first claim, Appellant challenges trial counsel's stewardship as it relates to the admission of his inculpatory statements, which he made to police on September 10,

1997. As indicated supra, following the discovery of Robin's body, the police learned Appellant was at the St. Francis Hospital emergency room, and after Appellant was discharged, detectives approached Appellant in the waiting room at approximately 1:54 p.m. When asked to accompany them to their office, Appellant agreed, and after arriving at the homicide office, Appellant waived his Miranda rights and made several inculpatory statements.

Trial counsel filed a pre-trial motion to suppress Appellant's confession. Detective Logan later testified that, during the interrogation, Appellant did not appear to be under the influence of alcohol, and Appellant specifically denied being under any such influence. Further, Detective Logan indicated Appellant appeared to be in full control of his faculties and spoke plainly. He clarified that, when the police went to find Appellant, they discovered him in the hospital's general emergency room where he had been seen by a doctor and released. Detective Logan questioned Appellant about wanting to be admitted for treatment in the psychiatric ward, and Appellant explained he went to the hospital only at his mother's insistence. Relying upon Detective Logan's testimony, the trial court denied Appellant's pre-trial suppression motion.

On direct appeal, appellate counsel argued the trial court abused its discretion in denying the defense motion to suppress Appellant's confession. Mitchell I, supra. Specifically, although appellate counsel conceded Appellant received his Miranda warnings and signed a waiver form prior to confessing, appellate counsel claimed that Appellant did not knowingly and intelligently waive his Miranda rights due to his diminished capacity. Mitchell I, supra. In support of this contention, appellate counsel

posited that Detective Logan approached Appellant immediately after psychiatric treatment, as he was leaving the St. Francis Hospital emergency room.

The Commonwealth, on the other hand, argued on direct appeal that the evidence presented at the suppression hearing did not substantiate Appellant's claim, and instead, supported the trial court's conclusion that Appellant's statement was the product of a rational and free waiver of his Miranda rights.   Mitchell I, supra.

In concluding Appellant had not demonstrated an abuse of discretion by the trial court in denying the suppression motion, this Court held, in relevant part, the following:

> Notwithstanding Dr. Bernstein's trial testimony that Appellant suffered from a number of different psychiatric conditions including alcoholic hallucinosis, Appellant did not present any evidence at the suppression hearing regarding his actual treatment or diagnosis at the emergency room, or any testimony regarding his mental health or alleged diminished capacity generally.   Moreover, upon careful consideration of all the facts herein, we are satisfied that Appellant has not demonstrated an abuse of discretion by the trial court in denying his suppression motion.   Detective Logan testified that when Appellant confessed he was in full control of his faculties, articulate, and coherent.   This testimony was clearly relied upon by the trial court and was undisputed at the suppression hearing.

Mitchell I, 588 Pa. at 55, 902 A.2d at 452.

Additionally, we noted that "there is no per se rule that a defendant's waiver of his constitutional rights is defective merely because his mental illness distorts [the] defendant's perceptions of reality."   Id. at 56 n.14, 902 A.2d at 452 n.14 (citing Commonwealth v. Logan, 519 Pa. 607, 549 A.2d 531, 537 (1988) (holding that a person with a mental illness, including a history of hallucinations and delusions, may be capable of waiving his constitutional rights, unless the confession flows from an internal compulsion to confess that is rooted in a mental disease)).   Accordingly, we concluded Appellant's argument of trial court error failed.

In seeking collateral relief, Appellant seizes upon the portions of our direct appeal analysis, which indicated he failed to present evidence regarding his mental health or alleged diminished capacity generally in support of his suppression motion. Thus, although Appellant acknowledges trial counsel moved to suppress his inculpatory statements, and appellate counsel raised the denial of the suppression motion on direct appeal, he now claims that trial counsel was ineffective in the manner in which he litigated the suppression issue.[9]   Specifically, he posits that trial counsel was ineffective in failing to present evidence at the suppression hearing establishing that Appellant: suffers from brain damage and cognitive impairment; is alcohol dependent; was drinking excessively on the day of the murder; appeared "out of it" and had bloodshot eyes at the time of his statement; was incoherent at times later on the day of the murder and on the day after the murder; and was likely suffering from alcohol withdrawal on the day of the murder. Appellant appears to assert that introduction of this evidence would have led the trial court to conclude his waiver was not knowing and intelligent because his mental status or diminished capacity interfered with his ability to have a full understanding of the nature of the right being abandoned and the consequence of the choice.

As this Court noted in Appellant's direct appeal, there is no per se rule that there can be no voluntary waiver when a person is mentally ill.  See Mitchell I, supra.  See also Sepulveda; supra; Logan, supra (holding defendants with proven psychological defects are capable of waiving their constitutional rights and give voluntary confessions).

_____

[9] Although Appellant litigated on direct appeal the issue of whether the trial court erred in denying his motion to suppress, we note that claims of ineffectiveness present a distinct ground for relief such that Appellant's ineffectiveness claim has not been previously litigated.  See Commonwealth v. Sepulveda, 618 Pa. 262, 55 A.3d 1108 (2012).

The voluntariness standard of Miranda requires that the prosecution prove by a preponderance of the evidence that the waiver is knowing and intelligent. This requires a two-step analysis. First, the waiver must have been voluntary in the sense that it was an intentional choice made without any undue governmental pressure; and, second, that the waiver must have been made with a full comprehension of both the nature of the right being abandoned and the consequences of that choice.

Logan, 519 Pa. at 619, 549 A.2d at 537 (citation omitted).

Thus, in the suppression realm, the focus is upon police conduct and whether a knowing, intelligent and voluntary waiver was effected based on a totality of the circumstances, which may include consideration of a defendant's mental…condition[.] Commonwealth v. Cox, 546 Pa. 515, 686 A.2d 1279, 1287 (1996). When a defendant alleges that his waiver or confession was involuntary, the question is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess.

Sepulveda, 618 Pa. at ___, 55 A.3d at 1136-37 (quotation marks and quotations omitted).

In developing his collateral claim, Appellant presents a laundry list of evidence, supported with citations to the PCRA hearing transcript, which he claims was available to trial counsel for use at the suppression hearing. For example, citing to four pages of PCRA hearing testimony from Dr. Barry M. Crown, a neuropsychologist, see N.T. 10/15/12, PCRA hearing, at 290, 293, 296, 319, Appellant asserts trial counsel should have presented testimony at the suppression hearing that Appellant suffers from brain damage and cognitive impairment. At the PCRA hearing, Dr. Crown testified he conducted neuropsychological testing on Appellant on September 15, 2011, and he opined Appellant has organic brain damage, resulting in functional impairments in memory, reasoning, and control. Id. at 291-96, 319.

Citing to two pages of PCRA hearing testimony, see id. at 227 and 390, Appellant contends trial counsel should have presented testimony indicating that he is alcohol

dependent. At the PCRA hearing, Dr. Richard Dudley, a psychiatrist who examined Appellant for the appellate process, diagnosed Appellant as suffering from alcoholism in remission due to his incarceration. Id. at 227. Moreover, at the PCRA hearing, Dr. Duncan Clark, a psychologist who did not examine Appellant but reviewed various records for PCRA purposes, opined Appellant suffered from alcoholism from approximately the age of fourteen. Id. at 390.

Citing to pages from the PCRA hearing testimony of Louis Harrell, who was a drug and alcohol counselor at St. Francis Hospital, and Wayne Mitchell, Sr., who is Appellant's father, Appellant contends trial counsel should have presented testimony indicating Appellant was drinking excessively during the day and night of September 9, 1997, as well as the early morning hours of September 10, 1997. Mr. Harrell testified he counseled Appellant, who indicated he drank several times a week. Id. at 477-80. Appellant's father testified he saw Appellant at approximately 2:30 p.m. on September 9, 1997, and Appellant was drunk. Id. at 523.

Citing to three pages from the PCRA hearing testimony of Brian Dallas, who was Appellant's friend, Appellant posits trial counsel should have presented evidence that Appellant had bloodshot eyes and appeared "out of it" at about the time of his interrogation by police. See id. at 543-45. Mr. Dallas testified that, after he learned of Appellant's arrest by watching the 5:00 p.m. news on September 10, 1997, Mr. Dallas immediately went to the police station. Id. at 542. He saw Appellant, who had bloodshot eyes, was crying, and looked "pretty much out of it." Id. at 544.

Citing to three pages from the PCRA hearing testimony of Rosalyn Guy-McCorkle, Esquire, who represented Appellant initially in connection with his arrest for the

September 1, 1997 rape of Robin, Appellant avers trial counsel should have presented evidence he was incoherent on the day of September 10 and the next day.[10]  See id. at 98-99, 102.  Attorney Guy-McCorkle testified she met with Appellant on September 11, 1997, in order to inform him that she would not be representing him in connection with the murder case.  Id. at 102.  In the end, because she was uncomfortable with Appellant, she decided to sever all ties with him.  Id. at 97.  Specifically, she testified that, on September 11, 1997, Appellant seemed "delusional" in that he was "fixated" on Attorney Guy-McCorkle, and he responded to her as if they were friends.  Id. at 98, 102.

Finally, citing to three pages from the PCRA hearing testimony of Dr. Clark, Appellant asserts trial counsel should have presented evidence that he was likely suffering from alcohol withdrawal on September 10, 1997.  See id. at 399-401.  Dr. Clark testified that, according to Appellant's records, he had episodes of binge drinking and withdrawal.  Id. at 399.  He noted that the September 10, 1997 records from Appellant's St. Francis Hospital emergency room visit revealed Appellant had a heart rate of 104, which is an indicator of alcohol withdrawal.  Id. at 399-400.  As a result thereof, Dr. Clark opined Appellant would have been more moody and more susceptible to persuasion on the afternoon of September 10, 1997.  Id. at 400-401.

In rejecting Appellant's ineffectiveness claim, the PCRA court, noting it considered Appellant's proffered evidence on his waiver issue as set forth supra, concluded there was no arguable merit to the underlying claim.  For instance, the PCRA court specifically

---

[10] Appellant also cited to two pages from the PCRA hearing testimony of his brother, DeVaughn Mitchell, to support this assertion.  See id. at 456, 459.  We have reviewed the cited pages and, while there is reference to Appellant's father being passed out on the couch, there is no reference to Appellant being incoherent.

dismissed Dr. Clark's opinions as "speculative," not credible, legally insufficient, and "clearly not rendered to a reasonable degree of medical certainty." PCRA Court Opinion, slip op. at 20-22. Likewise, the PCRA court dismissed Attorney Guy-McCorkle's testimony regarding Appellant's mental state as "vague," based on limited contact with Appellant, "dubious," and not supportive of Appellant's waiver contention. Id. at 23-24. Similarly, the PCRA court rejected Mr. Dallas' testimony as it related to Appellant's waiver argument as "neither credible nor persuasive," and based on a short, eight minute encounter, which under the circumstances, "sheds little light on [Appellant's] mental capacity to appreciate his rights."[11] Id. at 24-25.

The PCRA court further concluded the evidence and testimony offered by Appellant in support of his position (that his mental condition or diminished capacity impaired his ability to knowingly, voluntarily, and intelligently waive his Miranda rights) was contrary to the medical records submitted by Appellant at the PCRA hearing. Id. at 21. Specifically, the PCRA court found credible the records from Appellant's September 10, 1997 St. Francis Hospital emergency room visit, which commenced at approximately noon. The PCRA court noted that the hospital records revealed Appellant was being

---

[11] We note the cited portions of Dr. Crown's, Dr. Dudley's, Mr. Harrell's, and Appellant's father's testimony does not support Appellant's claim that he had a diminished capacity *at the time he waived his Miranda rights.* For instance, Dr. Crown testified as to Appellant's brain damage and cognitive impairment, from which testing revealed Appellant was suffering on September 15, 2011. Dr. Dudley and Mr. Harrell offered testimony as to Appellant being an alcoholic, but they did not offer testimony that Appellant was intoxicated or impaired when he waived his Miranda rights. Also, while Appellant's father testified he saw Appellant drunk, his reported observation was from approximately 24 hours prior to Appellant waiving his Miranda rights. Simply put, Appellant did not prove that testimony from these witnesses would have assisted him in establishing that he did not make his waiver with a full comprehension of both the nature of the right being abandoned and the consequences of that choice. Logan, supra.

evaluated for alcohol abuse, but his Breathalyzer reading was .000%. Id. at 21. The hospital records noted no medical problems, Appellant's physical status was "stable," his level of consciousness was noted as "alert," his impulse control was noted as "good," his behavior was noted as "cooperative," and he was noted to be neither suicidal nor homicidal. Id. at 21. The hospital records further indicated Appellant denied any current withdrawal, his appearance was noted as "appropriate," his speech was noted as "normal in tone, rate, and volume," his "content of speech and thought" was noted as "normal thought process," and his perception was noted as "no distortion." Id. at 21-22. The report further established Appellant's neurologic examination indicated his "cranial nerves were 'intact' and deep tendon reflexes were '2+' and his 'coordination' was 'normal.' He was found to be 'physically stable.'" Id. at 22.

The PCRA court concluded the hospital records confirmed the credible PCRA hearing testimony of Detective Logan that, when he picked up Appellant at the hospital on September 10, 1997, at 1:54 p.m., and read him the Miranda rights at 2:03 p.m., Appellant was capable of understanding and waiving his rights, showed no signs of slurred speech, had no red eyes, had a correct manner of walking, and gave an overall impression of sound mind and body. Id. at 22 (quoting N.T. 10/15/12, PCRA hearing, at 344-45). Thus, in consideration of all of the evidence and testimony presented, the PCRA court concluded there was no basis to find trial counsel ineffective in failing to present at the suppression hearing the list of evidence set forth by Appellant.

We are bound by the PCRA court's credibility determinations, which are supported by the record, and we conclude its analysis is free of legal error. See Robinson, supra. We discern no error in the PCRA court's finding that, based on the credible evidence and

testimony presented at the PCRA hearing, there was no obvious objective indication that Appellant suffered from any mental illness or diminished capacity at the time he waived his Miranda rights, such that the police conduct can be viewed as unconstitutional manipulation warranting suppression. Moreover, the totality of the circumstances surrounding Appellant's waiver of his Miranda rights and confession do not suggest that Appellant's alleged mental status interfered with the important, but simple (all he needs to say is "no") choice of whether to waive his constitutional rights. See Sepulveda, supra. Thus, since the evidence Appellant posits trial counsel should have presented at the suppression hearing would not have established that Appellant's alleged mental health issues interfered with his waiver, we conclude trial counsel was not ineffective in this regard.

Moreover, intertwined with his first claim, Appellant asserts trial counsel was ineffective in failing to present at the suppression hearing the testimony of a forensic pathologist to establish Appellant's confession was inconsistent with the physical evidence, thus leading to the legal conclusion the confession was coerced by police. In developing this argument, Appellant admits his confession reveals that, on the night of the murder, he raped Robin vaginally and anally, and he ejaculated in her rectum. However, at the PCRA hearing, Dr. Charles Wetli, a forensic pathologist, testified that the report from Robin's rectal swab was negative for seminal fluid in the anal or rectal areas, and although there was sperm inside of her vagina, there was insufficient evidence to determine whether the ejaculate was "fresh." N.T. 10/15/12, PCRA hearing, at 493-94. Additionally, Appellant admits that his confession reveals he stabbed Robin, but Dr. Wetli's PCRA hearing testimony established that, since there was blood found on a wall

just ten feet from Robin's body, "most likely" there would have also been blood on the perpetrator's clothing, which was absent from Appellant's clothes.   Id. at 496.

In rejecting Appellant's contention, the PCRA court concluded, to the extent Appellant's confession was inconsistent with the evidence, the alleged inconsistencies did not provide a basis to conclude Appellant's confession was coerced, particularly in light of the otherwise detailed nature of Appellant's confession, which Appellant did not dispute.   Moreover, there was no evidence the interrogation was so manipulative or coercive that it deprived Appellant of his ability to make a free and unconstrained decision to confess.   See Commonwealth v. Philistin, 617 Pa. 358, 383, 53 A.3d 1, 15 (2012). Thus, the PCRA court found no arguable merit to Appellant's underlying claim, and therefore, Appellant was not entitled to relief on his ineffectiveness claim.   The PCRA court's factual findings are supported by the record and we discern no legal error in this regard.   See Roney, supra.

**Claim II**

Appellant next maintains trial counsel was ineffective in advising him to plead guilty to the rape, IDSI, and unlawful restraint charges underlying the September 10, 1997 murder of Robin at CC No. 9713318.   Specifically, Appellant contends he pled guilty based solely on trial counsel's unreasonable advice that, by so doing, evidence of the sexual offenses would be barred at trial and would not be considered as an aggravating factor for purposes of imposing the death penalty.   See Brief for Appellant at 20.

We have held:

> Allegations of ineffectiveness in connection with the entry of a guilty plea will serve as a basis for relief only if the ineffectiveness caused [A]ppellant to enter an involuntary or unknowing plea.   In determining whether a guilty plea was

entered knowingly and intelligently, a reviewing court must review all of the circumstances surrounding the entry of that plea.

Commonwealth v. Allen, 557 Pa. 135, 732 A.2d 582, 587 (1999) (internal citations omitted).

Commonwealth v. Fears, ___ Pa. ___, at ___, 86 A.3d 795, 806-07 (2014).

In forwarding his PCRA claim, Appellant pointed to testimony he gave during the January 7, 2000 hearing on his motion to withdraw his guilty plea. Specifically, at the plea withdrawal hearing, Appellant testified trial counsel told him that none of the evidence of the sexual offenses would be introduced at trial or considered by the jury as an aggravating factor at the penalty-phase. N.T. 1/7/00, plea withdrawal hearing, at 3-5. He additionally testified he had no other reason to plead guilty to the sexual offenses.[12] N.T. 1/7/00, plea withdrawal hearing, at 3-5.

While the PCRA court acknowledged Appellant gave this testimony during the guilty plea withdrawal hearing, the PCRA court discounted Appellant's reliance on his self-serving testimony.[13] The PCRA court discounted Appellant's guilty plea withdrawal hearing testimony, in part, because the record established Appellant was aware that his guilty plea would not bar the jury from considering evidence of the September 10, 1997 sexual offenses. See PCRA Court Opinion, slip op. at 34-35. In this regard, the PCRA

---

[12] Trial counsel did not testify at the plea withdrawal hearing.

[13] The plea withdrawal hearing judge, who denied Appellant's motion to withdraw his guilty plea, indicated he denied Appellant's motion to withdraw since the plea was entered "largely for strategic purposes." N.T. 2/10/00, sentencing hearing, at 3. See Mitchell I, 588 Pa. at 40 n.11, 902 A.2d at 443 n.11. That is, the judge found "[trial] counsel tried to benefit from the severance in [Appellant's] plea by arguing to the jury that there was some remorse on his part because he had taken full responsibility for the rape and tried to use that to show why would one plead guilty and accept responsibility for a crime and then deny another one." N.T. 2/10/00, sentencing hearing, at 3-4.

court noted the following exchange, which occurred during Appellant's guilty plea hearing:

> [ADA]: So we're clear--I'm sure [trial counsel] would not try to do this. We understand, of course, although we're seeking a verdict of first-degree murder, that the jury will probably also be instructed in terms of second-degree murder, felony murder, a murder committed during the course of a rape, that no jeopardy attaches to the homicide of second degree by virtue of his plea; and you accept that notion; is that correct?
> [TRIAL COUNSEL]: I accept the notion.
> THE COURT: Right. Furthermore, that the jury will not only hear the evidence pertaining to the underlying felonies but will receive an instruction from the Court as to what those crimes are, just as if they were being instructed to determine guilt or innocence on those charges because they're going to have to know what they are in order to determine whether the underlying felony existed. It's an element of second degree.

N.T. 10/1/99, guilty plea hearing, at 21. See PCRA Court Opinion, slip op. at 34-35.

Moreover, the PCRA court specifically found Appellant presented no testimony or evidence at the PCRA hearing indicating trial counsel advised Appellant that, if he pled guilty, absolutely no evidence of the sexual offenses would be presented to the jury during the guilt or penalty phases.[14] See PCRA Court Opinion, slip op. at 33. Rather, the PCRA court found the only testimony presented during the PCRA hearing as to the reasons counsel advised Appellant to plead guilty was trial counsel's testimony indicating he advised Appellant to plead guilty to "minimize the amount of evidence and data coming out about [the sexual offenses] so that the jury would not be overwhelmed by those facts." See PCRA Court Opinion, slip op. at 31 (quoting N.T. 1/15/12, PCRA hearing, at 30).

The PCRA court deemed trial counsel's PCRA hearing testimony to be credible, thus concluding trial counsel advised Appellant to plead guilty in order to minimize the jury's exposure to the evidence of the sexual offenses, and not, as alleged by Appellant,

---

[14] Appellant did not testify at the PCRA hearing.

advised him that such a plea would absolutely bar the jury from hearing any evidence of the sexual offenses during the guilt and penalty phases. See PCRA Court Opinion, slip op. at 35. Thus, finding no arguable merit to the underlying claim, the PCRA court found counsel was not ineffective. Upon review, we conclude the PCRA court's credibility determinations and findings as to this issue are supported by the record, see Roney, supra, and its legal conclusions are free of error. See Busanet, supra. Thus, the PCRA court properly denied Appellant collateral relief on this ineffective assistance of trial counsel claim.[15]

**Claim III**

Appellant's next claim is trial counsel was ineffective in failing to investigate, develop, and present evidence during the guilt-phase to undermine the credibility of a key Commonwealth witness, Shelia Britton. Specifically, Appellant contends that, had trial counsel interviewed Ms. Britton prior to trial, he would have discovered that Ms. Britton briefly spoke to police officers during the morning when Robin's body was discovered, but she did not inform the police at that time about any telephone conversations she had with Appellant. Additionally, Appellant asserts trial counsel would have discovered that Ms. Britton remembered the telephone conversations only after she heard Appellant's voice in her sleep when she went to bed that night after Robin's body was found, prompting her to

---

[15] Appellant argues that, to the extent there was any waiver of his ineffective assistance of trial counsel claim, post-trial and appellate counsel were ineffective in failing to raise the ineffective assistance of trial counsel. See Brief for Appellant at 27. As indicated supra, under the dictates of Grant, Appellant's ineffective assistance of trial counsel claim need not be "layered" and has not been waived. In any event, we note that it is well-settled that, since Appellant did not prove his underlying claim of trial counsel's ineffectiveness, his derivative claims of post-trial and appellate counsel ineffectiveness also fail. Commonwealth v. Elliott, ___ Pa. ___, 80 A.3d 415 (2013).

go to a behavioral clinic the next morning. N.T. 10/15/12, PCRA hearing, at 80. According to Appellant, he was prejudiced by trial counsel's failure to interview Ms. Britton to discover the aforementioned information, which trial counsel could have then used to impeach Ms. Britton's trial testimony concerning the two telephone conversations she had with Appellant on the night of the murder.

As explained supra, Ms. Britton, a former director of a college-counseling program at the high school where both Appellant and Robin attended, testified at Appellant's jury trial concerning telephone conversations she had with Appellant at 1:00 a.m. and 4:00 a.m. on the morning of Robin's murder. In her trial testimony, Ms. Britton related, inter alia, that, at 1:00 a.m., Appellant told her he was going to go to Robin's house to kill her because she had "disrespected him," and at 4:00 a.m., he called her to report that "Robin Little is no more." N.T. 10/5/99, trial, at 330. Ms. Britton's trial testimony was consistent with a pre-trial statement, which she had given to police on July 23, 1998, approximately ten months after the murder.[16]

At the PCRA hearing, Ms. Britton testified that, after she gave the July 23, 1998 statement to police, she reviewed it in the office of then Assistant District Attorney (and now Judge) Edward Borkowski.[17] N.T. 10/15/12, PCRA hearing, at 77-78. She met with then ADA Borkowski two or three times, making corrections to her statement. Id. at 78-79. Ms. Britton did not disclose in either her July 23, 1998 police statement or at Appellant's trial that she had briefly spoken to police on the morning Robin's body was

---

[16] Ms. Britton testified at the PCRA hearing that she could not remember whether she or the police initiated contact on July 23, 1998. N.T. 10/15/12, PCRA hearing, at 76.

[17] Edward Borkowski was a Court of Common Pleas judge as of the time of Appellant's PCRA hearing; however, for the sake of consistency, we shall continue to refer to him as "then ADA Borkowski."

discovered, that she did not report the telephone calls at that time, or the manner in which she subsequently remembered her telephone conversations with Appellant. However, Ms. Britton testified at the PCRA hearing she told then ADA Borkowski prior to trial that she had talked to two police officers the morning Robin's body was discovered and she told then ADA Borkowski the manner in which she later remembered the telephone conversations, including the fact she went to therapy the next morning. Id. at 79-82. Ms. Britton additionally testified that, if someone from Appellant's defense team had interviewed her prior to Appellant's trial, she would have told them the manner in which she remembered the telephone conversations. Id. at 82.

Ms. Britton confirmed that, several years after Appellant was convicted and sentenced, she met with then assistant federal defender Carol Wright, who assisted in preparing Appellant's federal habeas corpus petition. Appellant presented at the PCRA hearing an affidavit from Attorney Wright, indicating that on August 1, 2007, she met with Ms. Britton, who told her about the telephone calls. There is no indication in Attorney Wright's affidavit that, on August 1, 2007, Ms. Britton mentioned anything about briefly talking to the police on the morning Robin's body was discovered or the manner in which she remembered the telephone conversations with Appellant. However, in the affidavit, Attorney Wright recounted a subsequent telephone conversation she had with Ms. Britton on March 20, 2008, wherein Ms. Britton told her the following:

> [T]he morning Robin died, Robin's mother called and [Ms. Britton] went over to her house. The police were there and they questioned her, but she went totally blank and could not remember anything about her conversations with [Appellant] the previous night. She did not tell the police officers anything about her conversations at that time. That evening when she went to bed all she started to remember [was] her interactions with [Appellant] the previous night. She told me the following morning she called a mental health facility and made an appointment with a psychiatric

social worker.  She discussed what she remembered with the social worker.

[Ms. Britton] told me that a different set of police officers questioned her at a later time and she told them all that she remembered about the phone calls with [Appellant].

Ms. Britton told us that she would have talked with [trial counsel] before trial and was surprised that they did not contact her.

Appellant's PCRA Evidentiary Hearing Exhibit 16.

Additionally, at the PCRA hearing, Ms. Britton confirmed that, on October 3, 2012, two police officers came to speak to her, and she told them the manner in which she remembered the telephone calls with Appellant.   N.T. 10/15/12, PCRA hearing, at 83. Ms. Britton admitted that, when Appellant's PCRA counsel made an appointment to meet with her, she choose not to attend the appointment and told him she would testify at the PCRA hearing only if she were subpoenaed.   Id. at 75.   Ms. Britton indicated that, when she first spoke to the police on the morning when Robin's body was discovered, she did not tell the police about Appellant's early morning telephone calls because she was extremely upset and shocked by the murder.   Id. at 84-85.   Ms. Britton confirmed that her trial testimony concerning the telephone calls was accurate and, at the time of trial, she recalled the telephone calls "vividly."   Id. at 86.

To rebut portions of Ms. Britton's PCRA testimony, the Commonwealth called then ADA Borkowski to testify at the PCRA hearing.   Then ADA Borkowski confirmed he was the trial prosecutor for Appellant, and prior to Appellant's trial, he had no awareness that Ms. Britton had briefly spoken to police officers on the morning Robin's body was discovered.   Id. at 166.   He confirmed there was no police report generated from any discussion the police had with Ms. Britton at that time, primarily because, to his

knowledge, she was not a known witness on the morning Robin's body was found. Id. at 166.

Then ADA Borkowski confirmed the police first learned of the telephone conversations Ms. Britton had with Appellant when they interviewed her on July 23, 1998, and he subsequently met with Ms. Britton prior to Appellant's trial to review the July 23, 1998 police report, which detailed her statement. Id. at 167-68. At this time, Ms. Britton made handwritten corrections to the report. Id. at 168. Then ADA Borkowski testified that, during his pre-trial interviews with Ms. Britton, she never told him the manner in which she had remembered the telephone conversations, and more specifically, she never told him she had remembered the telephone calls during a dream sequence or otherwise after going to sleep. Id. at 168-69, 171. He further had no information revealing Ms. Britton was in therapy. Id. at 174-75. He indicated that, had Ms. Britton provided him with information related to the manner in which she remembered the telephone calls prior to trial, he would have disclosed the information to the defense. Id. at 169, 172-73. Then ADA Borkowski confirmed he first learned of Ms. Britton's allegation as to how she remembered the telephone calls when he was informed his testimony might be required at Appellant's PCRA hearing. Id. at 169.

Trial counsel testified at the PCRA hearing that he was not made aware Ms. Britton remembered her telephone calls with Appellant while she was sleeping or that she had briefly spoken to police officers on the morning Robin's body was discovered. Id. at 17, 19. Had he known this information, he would have used it to discredit Ms. Britton's testimony, which trial counsel described as "devastating evidence" against Appellant. Id. at 19-20. Trial counsel admitted he did not interview Ms. Britton prior to Appellant's

trial, and he concluded such was "error on [his] part." N.T. 10/15/12, PCRA hearing, at 20.

In rejecting Appellant's claim of ineffectiveness, the PCRA court noted "the claim that counsel was ineffective presumes that [Ms.] Britton would have advised trial counsel of th[e] information during [a] pre-trial interview." See PCRA Court Opinion, slip op. at 51. However, the PCRA court found there was no credible evidence establishing that, had trial counsel interviewed Ms. Britton pre-trial, she would have disclosed such information to him. Id.

In this regard, the PCRA court found the first time Ms. Britton revealed her contact with police on the morning of the murder and the manner in which she recalled the telephone calls was on March 20, 2008, when Ms. Britton spoke to Attorney Wright for the second time, more than eight years after Appellant's jury trial. Id. at 50. The PCRA court found that, despite being given the chance to do so, Ms. Britton did not provide such information when she made her statement to the police on July 23, 1998, when she later made handwritten corrections to the July 23, 1998 police report, when she testified at Appellant's trial, or even when she initially spoke to Attorney Wright on August 1, 2007. Id. at 51, 54. The PCRA court concluded that, based on then ADA Borkowski's credible PCRA testimony, despite being given a chance to do so, Ms. Britton did not provide the Commonwealth with such information prior to Appellant's trial. Id. at 54. In light of the many "missed opportunities" for Ms. Britton to reveal the information now at issue, the PCRA court did not deem credible Ms. Britton's PCRA hearing testimony that, had trial counsel interviewed her prior to Appellant's trial, she would have disclosed either her initial contact with police on the morning Robin's body was discovered or the manner in

which she alleged to have remembered the telephone conversations with Appellant.[18] Id. at 54. Thus, concluding Appellant failed to prove a pre-trial interview of Ms. Britton by trial counsel would have yielded the information at issue, the PCRA court concluded Appellant failed to prove he was prejudiced by trial counsel's failure to interview Ms. Britton prior to trial. Id.

This Court has recognized that trial counsel has a general duty to undertake reasonable investigations or make reasonable decisions which render particular investigations unnecessary. Commonwealth v. Basemore, 560 Pa. 258, 744 A.2d 717 (2000). "The duty to investigate, of course, may include a duty to interview certain potential witnesses; and a prejudicial failure to fulfill this duty, unless pursuant to a reasonable strategic decision, may lead to a finding of ineffective assistance." Commonwealth v. Johnson, 600 Pa. 329, 351, 966 A.2d 523, 535-36 (2009). Nevertheless, "we have never held that trial counsel is obligated to interview every Commonwealth witness prior to trial." Commonwealth v. Washington, 592 Pa. 698, 719, 927 A.2d 586, 598 (2007). The failure of trial counsel to interview a particular witness prior to trial does not constitute ineffective assistance of counsel unless there is some showing that such an interview would have been beneficial to the defense under the facts and circumstances of the case. Commonwealth v. Pursell, 555 Pa. 233, 724 A.2d 293 (1999), cert. denied, 528 U.S. 975, 120 S.Ct. 422, 145 L.Ed.2d 330 (1999).

Here, the PCRA court, observing the demeanor of the witnesses, concluded there was no credible evidence establishing that any interview of Ms. Britton by trial counsel

---

[18] Contrary to Appellant's assertion on appeal, the PCRA court did not make a specific determination affirmatively finding that Ms. Britton's PCRA testimony of how she alleged to have remembered the telephone conversations was credible.

prior to trial would have revealed the information at issue. We agree with the PCRA court that this inference is a reasonable one deriving from the evidence presented at the PCRA hearing.

Contrary to Appellant, we conclude the PCRA court's credibility determinations are supported by the record, and are thus binding on this Court. Commonwealth v. Williams, 619 Pa. 219, 61 A.3d 979, 992 (2013). To the extent Appellant asserts it was inherently contradictory for the PCRA court to believe some portions of Ms. Britton's PCRA hearing testimony, but to disbelieve other portions, such as her testimony that, if interviewed by trial counsel prior to trial, she would have revealed the subject information, we note the PCRA court judge may believe all, some, or none of a particular witness's testimony. See Commonwealth v. Keaton, ___ Pa. ___, 82 A.3d 419 (2013); Mitchell I, 588 Pa. at 51, 902 A.2d at 449 (indicating finder of fact may believe all, part, or none of a witness's testimony). The fact the PCRA court disbelieved the portions of Ms. Britton's testimony upon which Appellant's ineffectiveness claim was premised provides no grounds for disturbing the decision below. See Keaton, supra (recognizing this Court does not disturb findings of the PCRA court that are supported by the record even where the record could also support a contrary holding). Thus, we agree with the PCRA court that trial counsel was not ineffective on this basis.

**Claim IV**

Appellant next alleges the Commonwealth failed to disclose evidence favorable to him in violation of his constitutional right to due process as recognized in Brady v.

Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[19] Under Brady and the decisional law it has spawned, a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature. Commonwealth v. Lesko, 609 Pa. 128, 15 A.3d 345, 370 (2011). Appellant contends the prosecutor here withheld the police department's "3-0" form[20] or "some record" of Ms. Britton's initial contact with police on the morning Robin's body was discovered. See Brief for Appellant at 37, 40.

We dispose of this claim by noting the PCRA court found the credible evidence failed to establish the responding officers in this case completed a "3-0" form or other record indicating Ms. Britton had contact with the police on the morning Robin's body was discovered. See PCRA Court Opinion, slip op. at 54-55. Thus, since Appellant failed to prove the evidence at issue ever existed, the PCRA court concluded Appellant failed to establish a Brady violation. See Commonwealth v. Small, 559 Pa. 423, 741 A.2d 666 (1999), cert. denied, 531 U.S. 829, 121 S.Ct. 80, 148 L.Ed.2d 42 (2000) (finding Brady claim failed where the appellant failed to show the alleged evidence ever existed).

Upon review, we find the PCRA court's factual findings are supported by the record, and its conclusions of law are free from legal error.[21] See N.T. 10/15/12, PCRA

---

[19] Appellant does not allege in his brief that the Commonwealth violated Pa.R.Crim.P. 305 (pre-trial discovery and inspection), which was renumbered Pa.R.Crim.P. 573, effective April 1, 2001. Rather, he argues the Commonwealth violated his general Constitutional rights to discovery.

[20] At the PCRA hearing, then ADA Borkowski explained the first uniformed officers at a crime scene would generally complete a standard form, referred to as a "3-0" or initial report, registering any persons who were present at the scene who may have relevant information. N.T. 10/15/12, PCRA hearing, at 174.

[21] Appellant additionally asserts that, to the extent the substantive Brady claim was waived under 42 Pa.C.S. § 9544(b), prior counsel was ineffective. Because the (continued…)

hearing, at 166-67 (then ADA Borkowski testified there was no report generated from Ms. Britton's alleged initial contact with police on the morning Robin's body was discovered); Id. at 170 (then ADA Borkowski testified, to his knowledge, police first interviewed Ms. Britton on July 23, 1998, and she made no mention of alleged initial contact with police); Id. at 173-74 (then ADA Borkowski testified there was no paperwork or forms generated by police indicating Ms. Britton talked to police on the day Robin's body was discovered); Id. at 165 (then ADA Borkowski testified he had "an open file," a practice in which he turned over to the defense every document of which he was aware, including police reports and notes); Id. at 50 (trial counsel confirmed that, if then ADA Borkowski had a report related to Ms. Britton, he would have disclosed it to him).

### Claim V

Appellant next asserts trial counsel was ineffective in failing to provide, prior to trial, critical evidence to the court-appointed defense psychiatric expert, Dr. Lawson Bernstein, a forensic neuropsychiatrist. Appellant lists such critical evidence, which we shall refer to collectively as "the Britton and Little documents," as including: (1) the July 23, 1998, police report of Ms. Britton's account of Appellant's telephone conversations with her before and after the murder of Robin; (2) letters Appellant sent to Ms. Britton after the killing indicating Robin deserved to die; and (3) entries from Robin's journal in which she indicated Appellant had threatened to kill her.[22] Appellant reasons that, due to the

---

(…continued)
underlying contention lacks merit, derivative claims of ineffectiveness necessarily fail. See Roney, supra.

[22] At trial, Robin's mother testified about the couple's relationship and read excerpts from Robin's journal.

ineffectiveness of counsel in failing to provide "the Britton and Little documents" to Dr. Bernstein, he was prejudiced during the guilt and penalty phases.

To understand this claim, some additional background is required. The record reveals Dr. Bernstein spent approximately one hour examining Appellant, and he reviewed Appellant's pediatric and St. Francis Hospital records, which included records from two hospital admissions when Appellant was fourteen years old and the emergency room records from the day of the murder. Dr. Bernstein also interviewed Appellant's mother to gather additional medical history, and he arranged to have Appellant undergo a brain MRI and an EEG test, the results of which for both turned out to be normal.

Based on his examinations and review, Dr. Bernstein prepared a preliminary report, in which he set forth his medical opinion that Appellant was incapable of forming the specific intent to kill at the time of the murder. At the end of his report, Dr. Bernstein included a paragraph requesting trial counsel to forward to his attention "all of the records that pertain to [Appellant's] arrest, any written or signed statements, and any police reports or other records in possession of the district attorney that are available for…review[.]" Appellant's PCRA Hearing Exhibit 4 at 4. Dr. Bernstein indicated it was essential that he review these documents prior to trial, and he would then amend or expand upon his report after reviewing the documents. Id. Despite Dr. Bernstein's request, trial counsel failed to provide the "the Britton and Little documents" to him prior to trial.

At Appellant's trial, on direct-examination, Dr. Bernstein testified, to a reasonable degree of medical certainty, as follows:

> I believe that at the time of the homicide [Appellant] was suffering from a number of different psychiatric conditions including alcohol abuse

and dependence, a condition called alcoholic hallucinosis wherein chronic use of alcohol induces auditory hallucinations or you hear voices.

I also believe he was suffering from a depression of moderate to severe severity, clinical depression, primarily due to chronic alcohol use.

I think those factors coupled with the other factors that we discussed, primarily the in utero or exposure to alcohol during the gestation when his mom was pregnant with him coalesced to the point where his cognitive capacity to premeditate and deliberate and form specific homicidal intent and be fully conscious of that intent was diminished, which is a forensic conclusion as opposed to a clinical conclusion.

Put a different way, I believe that he was mentally ill at the time of the event and that this mental illness diminished his capacity to premeditate, deliberate and form specific homicidal intent and be fully conscious of that intent.

N.T. 10/5/99, trial, at 556-57.  He further testified Appellant may have suffered from an alcohol-induced blackout at the time of the murder.  Id. at 557-58.

On cross-examination at trial, Dr. Bernstein admitted Appellant "most definitely does not have fetal alcohol syndrome," and as to Appellant's exposure to alcohol in utero, Dr. Bernstein admitted he was relying on Appellant's mother's representations made to him in 1999.  Id. at 561-63.  Also, Dr. Bernstein admitted records from St. Francis Hospital did not support the claim that Appellant's mother consumed alcohol while she was pregnant with Appellant.  "Consequently, the Commonwealth cast considerable doubt on Dr. Bernstein's conclusion that Appellant was born with a predisposition to neurological and psychiatric abnormalities due to his mother's drinking."  Mitchell I, 588 Pa. at 47, 902 A.2d at 447.

Moreover, Dr. Bernstein confirmed Appellant was of average or above average IQ, and he did well academically.  The prosecutor cross-examined Dr. Bernstein extensively regarding inconsistencies in his expert opinion and Appellant's records from his stays at St. Francis Hospital, upon which Dr. Bernstein relied, in order to cast doubt on Dr. Bernstein's expert opinion that Appellant was a long-term alcohol abuser suffering from

alcoholic hallucinosis and/or alcoholic blackouts. N.T. 10/5/99, trial, at 569-76, 580-90. During this cross-examination, Dr. Bernstein acknowledged notes from St. Francis Hospital included observations that Appellant was "very manipulative," "conscious about his manipulative and antisocial traits," and that he mumbled his words when angry. Id. at 581.

Additionally, the following exchange occurred on cross-examination regarding Robin's journal:

> Q: Doctor, were you given the journal entries of the victim in this case, Robin Little?
> A: No.
> Q: In fact, do you think it would have been beneficial in the interviewing process if you would have discussed with [Appellant] the representation that in September of 1996 the victim said that [Appellant] told her "He also told me if I leave him, he'll kill me"?
> Do you think that would have been beneficial to talk to him about?
> A: It doesn't surprise me that he made statements like that. I mean, this is a gentleman who has made homicidal statements a number of different times.
> Would it have been beneficial? Do I think it would have produced new information that would have changed my opinion? No, I don't.
> I'm not surprised that he would say something like that. In fact, he has made homicidal threats to others in the past.
> Q: Well, this was a specific homicidal threat toward the person who ended up dead a year later. Were you aware of any of the animosity and hostility that he expressed regarding the victim's dating or seeing other men?
> A: I was aware of that primarily from reading the police reports, yes.

Id. at 564-65.

Dr. Bernstein indicated he did not have the opportunity to review either the July 23, 1998 police report concerning Ms. Britton's statement or the letters, which Appellant sent to Ms. Britton after the murder. Id. at 567-68, 577. Regarding the letters, the prosecutor informed the jury that the letters from Appellant to Ms. Britton "came into the Commonwealth's possession a week and a half ago. I supplied them to [trial counsel].

Dr. Bernstein has not had an opportunity to go through those letters." Id. at 595. Dr. Bernstein then testified that, in light of the fact the letters were written by Appellant after the murder, the letters did not change his opinion or testimony. Id. at 596-97.

As this Court acknowledged in reviewing Appellant's direct appeal, Dr. Bernstein conceded at trial that he did not take "the Britton and Little documents" into account in rendering his opinions. See Mitchell I, 599 Pa. at 50, 902 A.2d at 449. However, Dr. Bernstein indicated that such information did not change his opinion. Mitchell I, supra; N.T. 10/5/99, trial, at 602.

At the PCRA hearing, Dr. Bernstein confirmed he was not provided with "the Britton and Little documents" prior to testifying at Appellant's trial, and he suggested that, as a result, his credibility was undermined during cross-examination. N.T. 10/15/12, PCRA hearing, at 187. Dr. Bernstein testified the ADA confronting him on cross-examination with the information pertaining to Appellant calling Ms. Britton prior to the murder, as well as the post-murder letters, made him look like he did not know what he was talking about. Id. However, Dr. Bernstein reiterated that, even if he had reviewed "the Britton and Little documents" prior to trial, his opinion concerning Appellant's diminished capacity would not have changed. Id. at 212.

At the PCRA hearing, trial counsel confirmed he did not provide the July 23, 1998, police report of Ms. Britton's account of Appellant's telephone conversations to Dr. Bernstein prior to Appellant's trial. N.T. 10/15/12, PCRA hearing, at 23. He testified he had no strategic reason for failing to do so. Id. Additionally, trial counsel confirmed that he did not provide to Dr. Bernstein the letters, which Appellant sent to Ms. Britton. Id. at 62.

Further, at the PCRA hearing, Kathleen Cribbins, Esquire, who represented Appellant during the penalty-phase, testified she sat in the courtroom for Appellant's guilt-phase trial and was aware that Dr. Bernstein had been cross-examined regarding documents, with which he had not been provided prior to trial. N.T. 10/15/12, PCRA hearing, at 117. Attorney Cribbins acknowledged Dr. Bernstein was provided with these documents prior to testifying at the penalty-phase. Id. at 121. As to the affect Dr. Bernstein testifying during the guilt-phase had on Attorney Cribbins' strategy for the penalty-phase, a relevant exchange occurred during the PCRA hearing as follows:

> [PCRA Counsel]: Did it obviously hurt your strategy in the guilt phase because Dr. Bernstein was your only expert?
> [Attorney Cribbins]: [Dr. Bernstein] ended up looking like somebody who didn't have a clue what he was talking about, because on cross-examination the DA just kept pulling up page after page of reports where things kind of contradicted what Dr. Bernstein had previously testified to, or called into question in some way what he had testified to, and he's the only thing to hang on to for the alleged diminished capacity defense.
> Once he's made to look like a fool, then from my cases I have one person to present to the jury that actually [Appellant] is not in his right head, that all the other things building up to it, you know, drinking as a 12-year-old, and constant drinking all through these years and everything else, all of that ultimately is dependent upon what Dr. Bernstein has to say about it and how it fits in. So if Dr. Bernstein is someone the jury is not going to accept as a dependable witness, then my penalty phase defense has a huge hole in it.
> [PCRA Counsel]: Do you feel that that's what happened?
> [Attorney Cribbins]: Yes.

Id. at 119-20.

In examining Appellant's ineffectiveness claim, the PCRA court initially concluded "[t]here is no dispute that counsel did not provide Dr. Bernstein with the materials at issue or that counsel had a reasonable strategy in failing to do so." See PCRA Court Opinion, slip op. at 62. However, the PCRA court ultimately rejected Appellant's ineffectiveness claim on the basis Appellant failed to demonstrate he was prejudiced by trial counsel's

failure to provide Dr. Bernstein with "the Britton and Little documents." In this regard, the PCRA court noted that, during trial and at the PCRA hearing, Dr. Bernstein confirmed the information with which he was not provided did not alter his opinions. Moreover, the PCRA court concluded that, while it was clear Dr. Bernstein was subjected to extensive cross-examination at trial, which may have adversely affected his credibility, the prosecutor's primary focus in the cross-examination was to discredit Dr. Bernstein's opinions based on the documents, which he had reviewed and relied on in forming his opinions. The PCRA court specifically held:

> [Appellant's] claim is that trial counsel was ineffective in failing to provide ["the Britton and Little documents"] to Dr. Bernstein and it was *this failure* that critically compromised Dr. Bernstein's credibility in both the guilt and penalty phases of the case. However, the conclusion that Dr. Bernstein's testimony was undermined solely, or even primarily, by the failure to provide the records at issue is not supported by the record.

See id. (emphasis in original).

Thus, the PCRA court held Appellant failed to demonstrate that, absent the prosecutor's cross-examination of Dr. Bernstein concerning "the Britton and Little documents," the outcome of Appellant's guilt or penalty phases would have been different.

We conclude the PCRA court's factual findings are supported by the record and its prejudice analysis is free of legal error.[23] See Robinson, supra. As this Court noted in reviewing Appellant's direct appeal, "[a]t trial, the Commonwealth attacked Dr.

---

[23] Having concluded the PCRA court properly determined Appellant failed to demonstrate he suffered prejudice as a result of trial counsel's failure to provide Dr. Bernstein with "the Britton and Little documents," Appellant's ineffectiveness claim fails on this basis alone. See Busanet, supra. Thus, we find it unnecessary to review the PCRA court's conclusion that the underlying claim has arguable merit and counsel lacked a reasonable basis.

Bernstein's expert opinion by pointing out inaccuracies in many of the facts that formed the basis of his opinion." Mitchell I, 588 Pa. at 47, 902 A.2d at 447. For instance, a detailed review of Dr. Bernstein's trial testimony indicates his credibility was called into question primarily based on discrepancies between his opinion and the medical forms he reviewed from St. Francis Hospital. Moreover, the record reveals the prosecutor limited his cross-examination of Dr. Bernstein concerning "the Britton and Little documents," and his questions did not yield a change in Dr. Bernstein's expert opinion. Furthermore, regarding the content of the victim's journal entries, wherein the victim described the couple's tumultuous relationship, Dr. Bernstein testified at trial that, despite the fact he was not provided with the victim's journal entries prior to trial, he was aware of the couple's relationship "from reading the police reports[.]" N.T. 10/5/99, trial, at 565. Moreover, the prosecutor specifically made the jury aware that Dr. Bernstein did not have an opportunity to review Appellant's letters, which he sent to Ms. Britton, because the Commonwealth had just received the letters a week and a half prior to trial.

Simply put, Appellant failed to prove that, absent the prosecutor's cross-examination of Dr. Bernstein concerning "the Britton and Little documents," the jury would not have rejected Dr. Bernstein's expert opinion that Appellant killed Robin under a state of diminished capacity and without the specific intent to kill. Thus, we agree with the PCRA court that Appellant did not meet his burden of proving prejudice as to the guilt-phase, i.e., that there is a reasonable probability that, but for counsel's failure to provide Dr. Bernstein with "the Britton and Little documents," the outcome of his trial would have been different. See Commonwealth v. Baumhammers, ___ Pa. ___, ___, 92 A.3d 708, 725 (2014). ("To show prejudice, the [appellant] must demonstrate that there is

a reasonable probability that, but for counsel's allegedly unprofessional conduct, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.") (citation omitted).

Further, we find no error in the PCRA court's conclusion that Appellant failed to demonstrate prejudice in the penalty-phase. Appellant suggests that, because trial counsel failed to provide Dr. Bernstein with "the Britton and Little documents" prior to trial, resulting in the prosecutor discrediting Dr. Bernstein's expert opinion at trial on cross-examination, the jury[24] likewise did not believe Dr. Bernstein's expert opinion at the penalty-phase as it related to Appellant establishing mitigating circumstances under 42 Pa.C.S. § 9711(e).

To support his claim, Appellant points to Attorney Cribbins' PCRA hearing testimony, wherein Attorney Cribbins testified she believed Dr. Bernstein's credibility was compromised on cross-examination during the guilt-phase, which carried over to the penalty-phase, "because on cross-examination the DA just kept pulling up page after page of reports where things kind of contradicted what Dr. Bernstein had previously testified to, or called into question in some way what he had testified to, and he's the only thing to hang on to for the alleged diminished capacity defense." N.T. 10/15/12, PCRA hearing, at 120.

While we acknowledge guilt-phase ineffectiveness may, under some circumstances, result in sentencing-phase prejudice, we find Appellant did not demonstrate such prejudice in this case. See Baumhammers, supra. As indicated supra, a detailed review of Dr. Bernstein's trial testimony indicates his credibility was

---

[24] The same jury sat for the guilt-phase and penalty-phase.

called into question on cross-examination primarily based on discrepancies between his opinion and the medical forms he reviewed from St. Francis Hospital. Attorney Cribbins' assessment as to the manner in which the prosecutor discredited Dr. Bernstein's expert opinions is consistent with our detailed review. Thus, Appellant failed to prove that, but for trial counsel's failure to provide Dr. Bernstein with "the Britton and Little documents," "[t]here is a reasonable probability that…[appellant] would have been able to prove at least one mitigating circumstance by a preponderance of the evidence and that at least one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s)." Philistin, 617 Pa. at 404, 53 A.3d at 28 (quotations omitted).

**Claim VI**

Appellant next contends trial counsel was ineffective in failing to present evidence, which irrefutably established that Appellant had struggled with severe alcoholism since childhood, and to use the evidence to rehabilitate Dr. Bernstein following the prosecutor's cross-examination of him at the guilt-phase. In this regard, Appellant suggests records from St. Francis Hospital, which trial counsel had in his possession prior to trial, revealed that Appellant became alcohol dependent at fourteen years of age. However, Appellant asserts that, due to trial counsel's failure to consult with Dr. Bernstein prior to trial, as well as counsel's failure to otherwise prepare to present this compelling evidence, the jury was not made aware of Appellant's alcohol dependence commencing at age fourteen. Additionally, Appellant contends trial counsel was ineffective in failing to use adequately the hospital records to rehabilitate Dr. Bernstein following cross-examination at the guilt-phase by showing that the records confirmed the early onset of Appellant's alcohol

dependence. Appellant suggests trial counsel's ineffectiveness, which led to the jury not being aware of Appellant's alcoholism as a juvenile, prejudiced him at the guilt and penalty phases.

In rejecting Appellant's claim, the PCRA court concluded Appellant failed to prove he was prejudiced by trial counsel's failure to consult with Dr. Bernstein, prepare, or use the St. Francis Hospital records adequately to rehabilitate Dr. Bernstein. In this regard, the PCRA court concluded there was extensive testimony and evidence presented to the jury throughout the guilt and penalty phases, which established Appellant's juvenile history of alcohol abuse and dependence. Thus, the PCRA court concluded additional evidence would have been merely cumulative, and therefore, Appellant failed to demonstrate he was prejudiced. See Commonwealth v. Spotz, 610 Pa. 17, 18 A.3d 244 (2011) (examining prejudice required for ineffectiveness in the guilt and penalty phases). Applying our standard of review, we find no error. See Robinson, supra.

For instance, at the guilt-phase, during direct-examination, trial counsel asked Dr. Bernstein whether he examined Appellant's medical records extending to his youth, and Dr. Bernstein replied affirmatively. N.T. 10/5/99, trial, at 538. Trial counsel asked Dr. Bernstein whether he reviewed Appellant's pediatric records, and when the trial court asked Dr. Bernstein for clarification as to what age was included in the pediatric records, Dr. Bernstein described such records as including Appellant's postnatal medical records extending into pre-adolescence, at which point Appellant's care began to center more at the level of psychiatric hospitals. Id. at 541. Dr. Bernstein testified that, based on the reports he reviewed, he discovered that Appellant "started drinking…at a fairly young age[.]" Id. at 542. Dr. Bernstein further testified Appellant self-reported that he began

drinking alcohol at eleven years of age.  Id.   Trial counsel specifically asked Dr. Bernstein whether he reviewed Appellant's St. Francis Hospital records, which involved two hospital stays when Appellant was fourteen years old, and Dr. Bernstein answered affirmatively.  Id. at 543.   Dr. Bernstein testified the reason Appellant was admitted for his first stay at St. Francis Hospital was because "his drinking was pretty out of control[,]…[and] he was having homicidal thoughts."  Id.   Trial counsel asked Dr. Bernstein why Appellant was admitted for a second stay at age fourteen, and Dr. Bernstein indicated two reasons.  Id. at 544.   One reason was "the drinking and the problems related to the drinking[,]" and the other reason was his aggressive acting out. Id.

Moreover, the following exchange occurred between trial counsel and Dr. Bernstein on direct-examination at the guilt-phase as to the St. Francis Hospital records from Appellant's stay when he was fourteen years old:

> Q:  In terms of St. Francis doing a psychological history and assessment of [Appellant], it states, "He's here due to his use of alcohol, and his mother feels he's an alcoholic.  He is described as being a binge drinker, etcetera."  Is that significant?
> A:  Well, sure.  I mean, for two reasons.  No. 1 is it speaks to the fact that this is more than a trivial alcohol problem.  This is a kid that at a very young age had a severe problem with alcohol.
> No. 2 is that significant use of alcohol, as I alluded to earlier, predicts the future in terms of propensity or the likelihood of developing significant psychiatric disease.
> When you use alcohol on a regular basis, you do two things.  No. 1 is you start killing off brain cells in significant numbers in a way that can affect behavior in a negative way, make you more likely to be violent and impulsive.  The other thing you do is you deplete the brain of certain chemicals which modulate normal mood.   It's sort of the gas that drives the system.
> As you continue to drink at this level, two things will happen.  You will have a greater and greater risk for participating in unplanned aggressive acts, being wild; and you will have a greater and greater risk of depleting these brain chemicals to such a point that you'll become clinically

depressed and in some instances psychotic. That is, you may hear voices, see things other people don't see, hallucinate.

So this level of severe alcoholism in a kid of this age is a bad prognostic indicator for the future.

Q: It also indicates [Appellant] is a 14-year-old black male of medium height, etcetera, etcetera. He reports having at least one blackout. He verbalizes being aggressive and having a short temper, and he admits that his usage often precipitates his overt conduct disorder.

Can the use of alcohol lead to blackouts?

A: Well, yes.

Id. at 547-49.

Furthermore, referring to the St. Francis Hospital records, trial counsel asked Dr. Bernstein whether Appellant admitting to homicidal ideations at the age of fourteen would be "in line with someone who has problems [Appellant] had in terms of his use of alcohol[.]" Id. at 550. Dr. Bernstein explained that such alcohol use actually changes the way the brain works so that the risk of violence is increased. Id. at 551. Dr. Bernstein indicated that the conclusions reached by St. Francis Hospital from Appellant's early hospitalizations reveal that Appellant has a tendency for aggressive violent behavior with a reasonably high potential for continuing acting-out behavior, and that his continuing alcohol use led Appellant to have worse episodes of unplanned aggressive acting out, as revealed by the records from Appellant's second hospital stay. Id. at 551-52. Dr. Bernstein opined alcohol was "at the center" of Appellant's stays at St. Francis Hospital when he was fourteen years old. Id. at 552. He further opined "[t]he focus or the center of the problem was the alcohol use. Then the other problems arose as the direct result of that." Id. Dr. Bernstein indicated that Appellant, at the age of fourteen, had a "treatable" substance abuse problem; however, without a proper family component, the odds of treating the problem were lessened. Id. at 554.

In establishing the lack of a proper family component, as well as further explaining Appellant's use of alcohol, trial counsel presented at the guilt-phase the testimony of Appellant's mother, who testified she and Appellant's father were alcoholics during Appellant's youth.  Id. at 484-85.  She confirmed Appellant was hospitalized for his chemical dependence at age fourteen, and he was drunk while at school.  Id. at 486-88. She testified she actually discovered Appellant had a problem with alcohol beginning when he was twelve or thirteen years old.  Id. at 489.  She described Appellant's continued use of alcohol throughout his teen years.  Id. at 489-95.

Moreover, during the penalty-phase, Dr. Bernstein testified his review of the case revealed Appellant had been chronically abusing alcohol since the age of eleven and his parents both abused alcohol.  N.T. 10/13/1999, sentencing hearing, at 807.  Dr. Bernstein testified Appellant was admitted to St. Francis Hospital at age fourteen due to his alcoholism; however, he did not receive the intensive psychotherapy or antidepressant drugs, which Dr. Bernstein would have recommended.  Id. at 815-16.

Additionally, during the penalty-phase, Appellant's mother testified about her and Appellant's father's use of alcohol during Appellant's childhood, as well as about Appellant's excessive use of alcohol while he was in middle school.  Id. at 826-27, 833-34.  Also, Louis Harrell, a drug and alcohol therapist at St. Francis Hospital, testified he mentored Appellant and attempted to help him deal with alcohol issues.  Id. at 864.

Based on the aforementioned, we find no error of law in the PCRA court's conclusion that, during the guilt and penalty phases, the jury was presented with ample evidence of Appellant's alcoholism since the age of fourteen, and thus, Appellant has not demonstrated the necessary prejudice in connection with his ineffectiveness claim.  See

Robinson, supra.  Appellant is under the mistaken notion that if only the jury had been presented with more details of his alcoholism, it would have accepted his diminished capacity defense and/or would not have returned a sentence of death.  See Spotz, supra; Commonwealth v. Miller, 605 Pa. 1, 49, 987 A.2d 638, 667 (2009) ("This Court has consistently held that trial counsel cannot be deemed ineffective for failing to present mitigating evidence that merely would have been cumulative of evidence that was presented during a penalty hearing.") (citations omitted).

**Claim VII**

Appellant next argues penalty-phase counsel was ineffective in failing to prepare, investigate, and present certain mitigating evidence.  More specifically, Appellant contends penalty-phase counsel ineffectively failed to (1) conduct neuropsychological testing to determine whether Appellant suffered from organic brain damage; (2) secure additional mitigation experts to testify concerning Appellant's early alcohol dependence, organic brain damage, and other mental health impairments; and (3) call additional family members and friends to testify regarding Appellant's traumatic childhood.[25]  Appellant avers that, if the details of his youth, troubled past, alcohol dependence, brain damage, and other mental health impairments had been addressed more extensively and presented in more detail, it would likely have swayed the jury toward mitigation.

> The inquiry of whether [penalty-phase] counsel failed to investigate and present mitigating evidence turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been

---

[25]  Appellant further contends penalty-phase counsel was ineffective in failing to provide the July 23, 1998 police report containing Ms. Britton's statement, as well as the letters Appellant sent to Ms. Britton, to Dr. Bernstein prior to trial.  For the reasons discussed under Claim V, supra, Appellant is not entitled to relief.

presented. However, '[n]one of these factor, by itself, is dispositive of the question presented, because even if the investigation conducted by counsel was unreasonable, such fact alone will not result in relief if the [petitioner] cannot demonstrate that he was prejudiced by counsel's conduct.

Commonwealth v. Simpson, 620 Pa. 60, ___, 66 A.3d 253, 277 (2013) (citation and quotation omitted).

To establish prejudice, a petitioner must prove:

[T]here is a reasonable probability that, absent counsel's failure to present the mitigation evidence he currently proffers, [Appellant] would have been able to prove at least one mitigating circumstance by a preponderance of the evidence and that at least one jury member would have concluded that the mitigating circumstance(s) outweighed the aggravating circumstance(s).

Philistin, 617 Pa. at 404, 53 A.3d at 28 (quotations omitted).

Initially, we address Appellant's contention that penalty-phase counsel was ineffective in failing to submit Appellant for neuropsychological testing in order to determine whether he suffered from organic brain damage. Appellant contends that, since Dr. Bernstein posited in his pre-trial report that Appellant "likely" suffers from organic brain damage, penalty-phase counsel should have ordered neuropsychological testing to confirm this fact. Furthermore, to support his argument, Appellant points to Dr. Bernstein's PCRA hearing testimony that, if he would have been asked to focus primarily upon the penalty-phase, he would have recommended neuropsychological testing prior to sentencing. N.T. 10/15/12, PCRA hearing, at 202.

At the PCRA hearing, Appellant presented evidence that neuropsychological testing conducted on September 15, 2011 revealed he suffered from organic brain damage, primarily affecting the functioning of his fronto-temporal area. Id. at 291, 293 (Dr. Crown testified he conducted neuropsychological testing on Appellant on September

15, 2011, and he opined Appellant has organic brain damage); Id. at 602 (Psychiatrist Bruce Wright acknowledged Dr. Crown found in 2011 that Appellant suffers from fronto-temporal impairment). However, as the Commonwealth notes, Appellant failed to prove at the PCRA hearing that he suffered from organic brain damage at the time of the murder, and more specifically, he failed to offer evidence at the PCRA hearing establishing that neuropsychological testing conducted in 1997 would have revealed Appellant suffered, at that time, organic brain damage as found by Dr. Crown in 2011.

For instance, while Dr. Crown indicated he reviewed various records and did not discover a cause for the organic brain damage from the time of Appellant's arrest in 1997 to the evaluation in 2011, he admitted that, as of the time of the murder, due primarily to Appellant's age, the front part of Appellant's brain was not fully developed. Id. at 303-06, 314-15. Moreover, Dr. Wright testified that organic brain damage happens over time and develops over decades from previous concussions. Id. at 602. Dr. Wright opined that, with regard to organic brain damage, just because it is present today does not mean it was present in the past. Id. at 603. Finally, Dr. Wright referred to testing performed in 1997, close to the time of the murder, which failed to reveal that Appellant suffered any cognitive impairment, which would result from organic brain damage. Id.

Further, as found by the PCRA court, Dr. Bernstein opined at length during the penalty-phase as to Appellant's "physical damage to the brain," which he suggested resulted from Appellant's ingestion of alcohol and traumatic injury to the fronto-temporal region of the brain in the form of a concussion. N.T. 10/13/99, sentencing hearing, at 800-04. Therefore, while penalty-phase counsel did not order neuropsychological testing, and Dr. Bernstein did not offer testimony about such testing, Dr. Bernstein's

opinion testimony, taken as a whole, presented the defense's mitigation position that Appellant suffered brain injury, which impaired his cognitive abilities. Thus, Appellant is not entitled to relief on this claim. See Philistin, supra.

Regarding Appellant's claims that penalty-phase counsel was ineffective in failing to secure additional mitigation experts to testify concerning Appellant's early alcohol dependence, organic brain damage, and other mental health impairments, as well as failing to call additional family members and friends to testify regarding Appellant's traumatic childhood, the PCRA court rejected these claims on the basis the additional testimony would have been merely cumulative of mitigation evidence offered by Appellant during the penalty-phase. Our review of the record confirms that penalty-phase counsel presented extensive evidence of Appellant's early alcohol dependence, organic brain damage, other mental health impairments,[26] and traumatic childhood. Therefore, additional testimony from mitigation experts, family members, and friends as to these factors would have been merely cumulative. Baumhammers, supra; Miller, 605 Pa. at 49, 987 A.2d at 667 ("This Court has consistently held that trial counsel cannot be

---

[26] An exception to our conclusion is that penalty-phase counsel did not specifically present evidence of Appellant's alleged borderline personality disorder, which Dr. Richard Dudley diagnosed Appellant as suffering from in his March 12, 2009 report. N.T. 10/15/12, PCRA hearing, at 227, 237, 240-41, 250-51. However, at the PCRA hearing, Dr. Dudley admitted that the personality is not "fixed" until a person is entering their adult years, and reports issued following the evaluation of Appellant close in time to the murder did not diagnose a borderline personality disorder. Id. at 241, 277-78. Thus, similar to his neuropsychological testing issue, Appellant has failed to demonstrate he suffered from a borderline personality disorder at the time of the murder such that penalty-phase counsel was deficient in investigating the matter further. See Spotz, supra (discussing penalty-phase counsel's duty includes investigating only reasonably available mitigating evidence and does not include investigating every conceivable line of mitigating evidence no matter how unlikely it is to assist the defendant in sentencing).

deemed ineffective for failing to present mitigating evidence that merely would have been cumulative of evidence that was presented during a penalty hearing.") (citations omitted).

**Claim VIII**

Appellant next claims the trial court erred in ruling that three mental health experts, who are employed by the Allegheny County Court's Behavior Clinic,[27] could not testify and their expert reports could not be reviewed or relied upon by Dr. Bernstein. This substantive claim of trial court error is waived since guilt-phase counsel did not object, and in fact, acceded to the trial court's rulings. N.T. 10/5/99, trial, at 302 (trial counsel withdrew request to call Dr. Moran, one of the mental health experts, to testify on behalf of the defense); Id. at 311 (trial counsel objected to the trial judge's offer to "bend [his] principles and allow [the parties] to use" the Behavior Clinic experts' reports, and specifically indicated he did not want the reports to be used). Moreover, penalty-phase counsel acceded to the preclusion of the mental health experts' reports and did not object to the preclusion of the mental health experts' testimony. Id. at 299-300 (penalty-phase counsel indicating, "[a]s long as the Commonwealth isn't going to cross-examine Dr. Bernstein on any opinion rendered in these reports[,]" she agreed the Behavior Clinic experts' reports could not be used); Id. at 525 (prior to Dr. Bernstein's trial testimony, penalty-phase counsel asked the trial court to remind the prosecutor not to inquire into the Behavior Clinic experts' reports upon cross-examination). Penalty-phase counsel did

---

[27] The Behavior Clinic performs psychological and psychiatric work for the trial court relative to competency and sentencing. In this case, Sabato Stile, M.D., evaluated Appellant following his arrest in connection with the September 1, 1997 rape; Christine Martone, M.D., evaluated Appellant one day after the murder; and Michael Moran, Ph.D., evaluated Appellant a few weeks after the murder. Each expert then provided a report to the trial court as it related to Appellant's competency.

not alter her position on the issue, request the trial court to reconsider the issue, or otherwise seek to use the experts' reports or testimony for purposes of the penalty-phase. Furthermore, counsel did not present this issue on direct appeal. Therefore, Appellant's claim of trial court error is waived. See 42 Pa.C.S. § 9544(b) ("[A]n issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, [or] on appeal[.]").

However, this does not end our inquiry as Appellant additionally couched his claim in terms of guilt and penalty phase counsel ineffectiveness. Appellant contends guilt-phase counsel was ineffective in withdrawing his request to call a Behavior Clinic expert as a witness and objecting to the trial court's offer to permit the parties to utilize the Behavior Clinic experts' reports. Also, he contends penalty-phase counsel was ineffective in failing to seek to utilize the experts' testimony or reports for mitigation purposes during the penalty-phase.

In rejecting Appellant's ineffectiveness claims, the PCRA court concluded guilt and penalty phase counsel made reasonable, strategic decisions that they would rather have the Behavior Clinic experts and reports, including Dr. Moran, excluded than be faced with the prospect of the Commonwealth presenting the opinions of Drs. Martone and Stile during the guilt or penalty phases. See PCRA Court Opinion, slip op. at 92. The PCRA court held that, while in retrospect, counsel now feels that it may have been a better strategy to use the reports and testimony, such does not require the conclusion counsel was ineffective in adopting the strategy used at the time of trial and sentencing. Id. We find ample factual support in the record for the PCRA court's determination and no error in its legal conclusion. See Robinson, supra.

For instance, the record reveals that, during the guilt-phase, counsel noted he intended to call Behavior Clinic expert, Dr. Moran, as a witness and/or utilize his expert report since his opinions were favorable to the defense; however, guilt-phase counsel immediately withdrew his request when he discovered the prosecutor had subpoenaed Dr. Martone with the intent of calling her as a rebuttal witness. N.T. 10/5/99, trial, at 300-06. Undeterred by guilt-phase counsel's withdrawal of his request, the prosecutor continued to argue that he should be permitted to present the testimony of Dr. Martone or, in the alternative, use Drs. Martone's and Stile's reports in cross-examining Dr. Bernstein. Id. at 303-04. Specifically, the prosecutor argued that, since Drs. Martone's and Stile's characterizations of Appellant's mental state were favorable to the prosecution, and much different than Dr. Bernstein's characterizations, it was unfair to the Commonwealth to limit the use of the Behavior Clinic experts' reports. Id. at 304. At this point, both guilt and penalty phase counsel sought assurances that the trial court would not permit the prosecutor to cross-examine Dr. Bernstein with the Behavior Clinic experts' reports, ultimately concluding with guilt-phase counsel specifically objecting to the trial court's offer that the parties could utilize the experts' reports. Id. at 311.

The record reveals that, upon balance, guilt and penalty phase counsel concluded that any benefit to the defense in utilizing Dr. Moran's testimony or report would be outweighed by the harm resulting from the Commonwealth utilizing Drs. Martone's and Stile's testimony or reports. Inasmuch as Drs. Martone's and Stile's reports contained potentially damning information for the defense,[28] such a course of conduct constitutes a

---

[28] For instance, Dr. Stile interviewed Appellant on September 3, 1997, and he reported Appellant "is in no acute physical or emotional distress. He denies voices, visions, (continued…)

reasonable basis. Commonwealth v. Spotz, ___ Pa. ___, 84 A.3d 294, 311 (2014) ("Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests.") (citation omitted).

Further, as the PCRA court noted, the fact counsel suggested during the PCRA hearing that, in hindsight, the defense should have used the Behavior Clinic experts' reports or testimony during the guilt and the penalty phases does not negate the conclusion that counsel had a reasonable basis for the strategy employed. N.T. 10/15/12, PCRA hearing, at 128-29; Commonwealth v. Sneed, 616 Pa. at 20, 45 A.3d at 1108 ("A claim of ineffectiveness generally cannot succeed through comparing, in hindsight, the trial strategy employed with alternatives not pursued.") (quotation and quotation marks omitted); Commonwealth v. Washington, 592 Pa. at 712, 927 A.2d at 594 ("In determining whether counsel's action was reasonable, we do not question whether there were other more logical courses of action which counsel could have

_____

(…continued)
suicidal or homicidal urges. He indicates adequate sleep, appetite and mood." Petitioner's PCRA Evidentiary Hearing Exhibit 8. Moreover, Dr. Stile's impression was that Appellant is nonpsychotic, understands the charges against him, and should be judged according to the evidence.

Dr. Martone interviewed Appellant the day after the murder, on September 11, 1997, and she reported Appellant "was oriented in all three spheres. His memory was intact. His thoughts were logical and coherent and free of loosened associations. There was no evidence of delusions or hallucinations. His affect was dysphoric and tearful. He denies homicidal ideation." Petitioner's PCRA Evidentiary Hearing Exhibit 9. Dr. Martone's recommendation was that Appellant understood the charges against him, was able to cooperate with his defense, and should be judged according to the evidence.

pursued; rather, we must examine whether counsel's decisions had any reasonable basis.") (citations omitted). Thus, Appellant is not entitled to relief on this claim.

## Claim IX

Appellant's next claim is penalty-phase counsel was ineffective in failing to argue the Commonwealth could not introduce evidence of the IDSI and two rape convictions that Appellant committed against Robin in order to rebut his mitigating evidence of no significant history of prior convictions, and counsel was ineffective in failing to request the trial court to so instruct the jury. To understand these ineffectiveness claims, some additional background is required.

On direct appeal, appellate counsel argued that, at the penalty hearing, the prosecutor stipulated to the Section 9711(e)(1) mitigator, 42 Pa.C.S. § 9711(e)(1), that Appellant had no significant history of prior criminal convictions, and thus, the trial court committed reversible error by permitting the Commonwealth to present evidence to refute this stipulation. In response, the Commonwealth argued it stipulated only that Appellant did not have a significant prior criminal history, but it did not stipulate that Appellant's instant convictions for IDSI and rape against Robin could not be used to rebut the mitigating circumstances that Appellant up until his conviction had no prior significant criminal history.

After reviewing the record to determine the exact terms of the parties' stipulation, this Court held there was no stipulation to any mitigating factor, and the Commonwealth stipulated only that Appellant had no prior significant criminal history before the present convictions. See Mitchell I, supra. Consequently, we concluded that, by entering into the stipulation, the defense was relieved of the burden of calling witnesses to prove that

Appellant had no criminal history prior to the current conviction; however, once penalty-phase counsel argued that fact as a mitigating circumstance, under the stipulation, as well as Commonwealth v. Wharton, 542 Pa. 83, 665 A.2d 458 (1995), cert. denied, 517 U.S. 1247, 116 S.Ct. 2504, 135 L.Ed.2d 195 (1996), the Commonwealth was free to rebut it with evidence of Appellant's contemporaneous convictions for IDSI and rape. See Mitchell I, supra.

We specifically noted that neither penalty-phase counsel nor appellate counsel definitively challenged the propriety of the use of Appellant's contemporaneous criminal convictions as appropriate rebuttal to his assertion in mitigation that he had no significant criminal history. Mitchell I, 588 Pa. at 72 n.20, 902 A.2d at 462 n.20. Rather, we found that Appellant's counsels' assertions before the trial court and on direct appeal focused upon Appellant's claim that the Commonwealth stipulated to a mitigator and then attempted to circumvent such stipulation by introducing the current convictions as rebuttal. Id.

In seeking collateral relief, Appellant now contends penalty-phase counsel was ineffective in failing to object on the alternative basis, i.e., that, in any case, Appellant's contemporaneous convictions could not be considered as prior criminal convictions under Section 9711(e)(1) and the Commonwealth could not use such convictions to rebut the Section 9711(e)(1) mitigator. Additionally, Appellant contends penalty-phase counsel was ineffective in failing to request a jury instruction in accordance with these principles.

The PCRA court rejected Appellant's ineffective assistance of counsel claims on the basis the underlying issues lacked arguable merit. Inasmuch as controlling precedent at the time of Appellant's proceedings in 1999, as well as today, provides that,

when a capital defendant is convicted of offenses in conjunction with first degree murder, the Commonwealth may use those convictions to rebut the Section 9711(e)(1) mitigating circumstance, we find no error of law in the PCRA court's conclusion.[29]  See Wharton, supra (holding that, to rebut a defendant's assertion of the Section 9711(e)(1) mitigator, the Commonwealth is permitted to present all of the defendant's prior convictions, including those which were contemporaneous with the defendant's first degree murder conviction).  See also Commonwealth v. Weiss, ___ Pa. ___, 81 A.3d 767 (2013) (holding counsel is not ineffective in failing to request a jury instruction for which there is no legal basis); Philistin, supra (holding that, if counsel presents evidence of a defendant's lack of criminal record, the Commonwealth is permitted to argue in rebuttal that the defendant had just been convicted of other offenses).

**Claim X**

Appellant next argues the trial court erred in charging the jury during the penalty-phase as to the nature of the aggravating and mitigating circumstances.  He suggests the instruction given by the court diverted the jury's attention to the circumstances of the offense, thereby improperly minimizing the importance of Appellant's character and background.  Specifically, Appellant challenges the following sentence of the trial court's jury instruction generally explaining the concept of aggravating and mitigating circumstances:

> [A]ggravating circumstances are things about the killing and the killer which make a first-degree murder case more terrible and deserving of the death

---

[29] Appellant additionally presents a derivative claim of ineffective assistance of appellate counsel; however, since the underlying contentions lack arguable merit, Appellant's derivative claim of appellate counsel's ineffectiveness necessarily fails.  See Roney, supra.

penalty, while mitigating circumstances are those things which make the case less terrible and less deserving of death.

N.T. 10/13/1999, sentencing hearing, at 767-68.

Appellant admits penalty-phase counsel did not object to this portion of the trial court's charge and counsel did not raise the issue on direct appeal. See Appellant's Brief at 84-85. Accordingly, the substantive issue of trial court error has been waived. 42 Pa.C.S. § 9544(b).

Recognizing the likelihood we would find the claim of trial court error to be waived, Appellant additionally argues penalty-phase counsel was ineffective in failing to object to this portion of the trial court's instruction. The challenged instruction was, at the time of Appellant's trial and sentencing in 1999, part of a Pennsylvania suggested standard criminal jury instruction. See Commonwealth v. Spotz, 610 Pa. 17, 82-3, 18 A.3d 244, 282-83 (2011). Though the instruction was modified subsequent to Appellant's trial and sentencing, resulting in the trial court's version of the jury instruction being removed therefrom, this Court has repeatedly upheld the instruction as constitutionally adequate, even after it was excised from the suggested standard instructions. See Simpson, supra (rejecting the appellant's assertion the instruction improperly minimized the appellant's character and background); Commonwealth v. Spotz, 610 Pa. 17, 18 A.3d 244 (2011) (concluding the instruction's focus on "terribleness" did not produce an arbitrary and capricious sentence based upon passion and prejudice); Washington, supra (rejecting the appellant's assertion the instruction improperly restricted the weight afforded mitigating factors that did not affect the "terribleness" of the offense). Based on this Court's ample precedent, Appellant's underlying claim lacks arguable merit, and therefore, his derivative claim of ineffectiveness fail.

**Claim XI**

Finally, Appellant indicates he is entitled to relief from his conviction and sentence based on the cumulative prejudicial effect of the errors he identifies above. In response, the Commonwealth argues that no amount of failed claims may collectively attain merit.

"This Court has held that no number of failed ineffectiveness claims may collectively warrant relief if they fail to do so individually." Elliott, ___ Pa. at ___, 80 A.3d at 450 (citation omitted). "However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed." Spotz, __ Pa. at __, 84 A.3d at 321 n.22 (citations omitted).

We have examined Appellant's claims, which we rejected solely because of his failure to prove prejudice. We are satisfied that the ineffectiveness claims at issue are so disparate that there is no cumulative prejudice warranting relief.

The order of the PCRA court is affirmed.

Mr. Chief Justice Castille, Messrs. Justice Saylor, Eakin and Baer and Madame Justice Todd join the opinion.

Mr. Justice Saylor files a concurring opinion.