J-S44030-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KINTE L. FORD | : | |
| | : | |
| Appellant | : | No. 2885 EDA 2022 |

Appeal from the PCRA Order Entered October 28, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0003558-2013

BEFORE:   OLSON, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY NICHOLS, J.:                    **FILED MARCH 14, 2024**

Appellant Kinte L. Ford appeals from the order denying his Post

Conviction Relief Act[1] (PCRA) petition.  Appellant argues that his trial counsel

was ineffective.  After review, we affirm.

The PCRA court summarized the relevant facts and procedural history

of this matter as follows:

> [The victim] was Appellant's girlfriend on January 25, 2013.  She
> often stayed at Appellant's home . . . with him and his mother,
> Gloria Ford.  [The victim] testified that Appellant had left the home
> around 11:00 pm on January 25, 2013.  In the early morning
> hours of January 26, around 1:00 a.m., Appellant came back
> home while [the victim] was in [Appellant's] room on the third
> floor, talking with a friend on her cell phone.  [The victim] testified
> that Appellant was upset, because "he basically thought I was on
> the phone with a guy."  The couple briefly argued, then Appellant
> hit [the victim] on the face with a closed fist, breaking her glasses.

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 42 Pa.C.S. §§ 9541-9546.

He told her to sleep on a couch in the first floor living room instead of upstairs. [The victim] took her phone and charger downstairs.

After a few minutes, Appellant came downstairs, took [the victim]'s cell phone from her, and returned upstairs. [The victim] testified that, about three or four minutes later, Appellant came back downstairs and stood in front of [her], cursing and calling her a liar. Appellant then punched her and pinned her on the couch. She tried to get Appellant off her, telling him to "calm down, just stop." Appellant then "thrust" [the victim] around with his hands on her shoulders. At a certain point in the struggle, Appellant pulled down [the victim's] green elastic-waist pants and ripped off her panties. He pulled down his own pants and put his penis inside [the victim's] vagina. [The victim] was trying to kick Appellant off her body, until she eventually "[got] tired and restless of trying to fight [him] off," and "shut down" at a certain point during the assault.

The commotion woke up Ms. Ford. She came out of her room. In her statement to Detective Jenkins, [the victim] said that Ms. Ford "came all the way downstairs and got [Appellant] off [her] while [they] were having sex." At trial, however, [the victim] testified that Appellant had actually pulled his penis out and "fixed himself' before his mother approached the top of the stairs. Ms. Ford came downstairs and went into a closet to get "something metal ... a bat or a golf club." Ms. Ford then took [the victim] upstairs to the third floor in order to keep her away from Appellant, who was "still pissed off flying through the house, pacing back and forth, up and down the stairs." [The victim] sat down on Ms. Ford's bed. Appellant came upstairs and began arguing with his mother as she blocked him from entering through the doorway. [The victim] stood up behind Ms. Ford. Appellant threw a left fist at [the victim's] right eye, followed by a right fist to her forehead. [The victim's] forehead was cut, causing blood to drip down her face and onto her clothes. Ms. Ford told Appellant to leave and took [the victim] into the bathroom, where she gave her a rag for the blood on her face.

Ms. Ford exited the bathroom, leaving [the victim] in there and closing and locking the door behind her. Shortly thereafter, Appellant began hitting the door, eventually busting through it. Appellant balled up his fist and made a threatening jump at [the victim] before finally leaving the house. [The victim] testified that Appellant had his hands in his pockets, and she later told detectives that Appellant was holding a gun. On his way out of

the house, Appellant touched [the victim's] temple and said "I'll blow your brains out."

Once [Appellant] left, Ms. Ford drove [the victim] to her best friend Latiya's house . ...  Around 3:30 am, Ms. Ford dropped [the victim] off near the McDonald's ... , about halfway to Latiya's house.  Once she got to the house by foot, [the victim] "banged on the door" but Latiya did not answer.  One of Latiya's neighbors eventually opened the door and let [the victim] sleep in a spare room for the night.

On January 26, uniformed officers brought [the victim] into Special Victims' Unit for an interview.  After the interview, [the victim] went to Philadelphia Sexual Assault Response Center (PSARC) for an examination.  Nurse examiner Karen Doughtery observed an abrasion, laceration and tenderness on [the victim's] head; swelling, a bruise, and tenderness on her eyes; abrasion and tenderness on her mouth; bruising and swelling with tenderness to her right eye lower lid; an approximate 1 cm linear laceration to the forehead above the eyebrow with tenderness; a 3 cm scratch-like wound to the left face and orbit (the area that surrounds the eye); and an approximate half centimeter abrasion to the upper lip and gum.

Acid phosphatase, a component of human seminal fluid, was inconclusive in all the swabs from [the victim's] sexual assault kit.  Neither P30 (another component of human seminal fluid) nor sperm was found on any of the swabs.  A brown stain, similar in appearance to blood, was found on the outside of [the victim's] sweat pants.  Additionally, microscopic examinations found sperm on [the victim's] torn [underwear].  Lissette Vega of the Philadelphia Police DNA lab concluded that Appellant, to a reasonable degree of scientific certainty, is the source of the sperm.  However, there are no tests that can be performed to conclusively determine whether a rape occurred, due to the physical nature of genital tissue.

Ms. Ford's testimony conflicted with [the victim's] on several points.  She testified that [the victim] came downstairs from the third floor back bedroom (Appellant's bedroom) around 2:00 am and knocked on her door, asking if she could sleep on the couch downstairs.  Her eyes were bloodshot "like she was drinking."  She told Ms. Ford that she couldn't sleep and that she was waiting for Appellant to come home.  Ms. Ford testified that [the victim] said "I'm waiting for [Appellant] to come in.  I know he's messing with

another girl ... I'm going to wait to see when he gets in here because he's going to get his." The two women stayed in Ms. Ford's room talking for 15 to 20 minutes.

Ms. Ford testified that Appellant came home some time between 2:15 and 2:30 am. When they heard him come home, [the victim] got up off the bed, "ranting and raving" and saying "here comes that mother fucker." Appellant came upstairs and asked what was the matter. Ms. Ford testified that she was standing in the doorway between [the victim] (in the room) and Appellant (in the hallway). Ms. Ford asked Appellant to leave because it was 2:30 am and she didn't want any arguments starting in her house. Before he walked away, [the victim] reached over Ms. Ford "to try and hit him and scratch him." Ms. Ford testified that she backed up and stumbled and fell on [the victim], accidentally causing [the victim] to hit her head on a dresser by the bedroom door. Ms. Ford took [the victim] to the bathroom and got her a cold rag for her face. Ms. Ford testified that she never grabbed a golf club from the closet. She also testified that she never saw her son downstairs or having intercourse with [the victim] that evening.

PCRA Ct. Op., 3/20/23, at 2-4 (formatting altered and citations omitted).

Following a jury trial, Appellant was convicted of rape by forcible compulsion, aggravated assault, sexual assault, and terroristic threats.[2] The trial court sentenced Appellant to an aggregate term of seventeen and one-half to thirty-five years of incarceration. Appellant filed a post-sentence motion for a new trial, which was denied by operation of law on February 11, 2016. On February 17, 2016, Appellant filed a timely notice of appeal, and this Court affirmed Appellant's judgment of sentence. *Commonwealth v. Ford*, 515 EDA 2016, 2017 WL 2791129 (Pa. Super. filed on Jun. 17, 2017) (unpublished mem.).

---

[2] 18 Pa.C.S. §§ 3121(a)(1), 2702(a)(1), 3124.1, and 2706(a)(1), respectively.

On February 18, 2018, Appellant filed a timely first PCRA petition. The PCRA court subsequently appointed counsel, who filed an amended PCRA petition arguing that direct appeal counsel was ineffective for failing to file a petition for allowance of appeal to our Supreme Court. On October 24, 2018, the PCRA court granted Appellant's PCRA petition and reinstated Appellant's right to file a petition for allowance of appeal in the Supreme Court of Pennsylvania. On December 31, 2018, Appellant filed his petition for allowance of appeal, and on April 30, 2019, our Supreme Court denied Appellant's petition. **Commonwealth v. Ford**, 561 EAL 2018, 207 A.3d 908 (Pa. 2019).

On October 30, 2019, Appellant filed a timely *pro se* PCRA petition.[3] The PCRA court appointed James Lloyd, Esq. (current counsel), to represent

_____

[3] We note that "the timeliness of a PCRA petition is a jurisdictional requisite." **Commonwealth v. Brown**, 111 A.3d 171, 175 (Pa. Super. 2015) (citation omitted). A PCRA petition, "including a second or subsequent petition, shall be filed within one year of the date the judgment becomes final[.]" 42 Pa.C.S. § 9545(b)(1). Under the PCRA "a judgment becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States and the Supreme Court of Pennsylvania, or at the expiration of time for seeking the review." **See** 42 Pa.C.S. § 9545(b)(3). Here, Appellant's October 30, 2019 PCRA petition was chronologically his second petition, but because his first PCRA petition resulted in the reinstatement of appellate rights *nunc pro tunc*, the October 30, 2019 PCRA petition, was treated as a first PCRA petition. **See Commonwealth v. Vega**, 754 A.2d 714, 716 n.3 (Pa. Super. 2000); **see also Commonwealth v. Karanicolas**, 836 A.2d 940, 944 (Pa. Super. 2003) (explaining that when a PCRA petitioner's direct appeal rights are reinstated *nunc pro tunc* in a first PCRA petition, a subsequent PCRA petition will be considered a first PCRA petition for timeliness purposes). Accordingly, Appellant's judgment of sentence became final for purposes of the PCRA on Monday, July 29, 2019, ninety days after our Supreme Court
*(Footnote Continued Next Page)*

Appellant. Current counsel filed an amended PCRA petition arguing that trial counsel was ineffective for failing to introduce evidence of electronic messages exchanged via Facebook Messenger between Appellant and the victim. **See** Amended PCRA Pet., 10/23/20, at ¶¶47-55. Appellant alleged that the messages supported his position that he did not sexually assault the victim and that the victim fabricated the sexual assault. **See id.** at ¶¶47-55.

The PCRA court held a hearing on August 24, 2022, and on October 28, 2022, the PCRA court denied Appellant's PCRA petition. Appellant filed a timely notice of appeal, and both the PCRA court and Appellant complied with Pa.R.A.P. 1925.

On appeal, Appellant presents the following issue:

Did the PCRA Court err and/or abuse its discretion when it denied and dismissed [Appellant's PCRA petition] seeking a new trial based upon a claim that trial counsel was ineffective for failing to utilize at trial a Facebook message exchange between [A]ppellant and [the victim] which was favorable to [Appellant]?

Appellant's Brief at 4.

Appellant argues that trial counsel was ineffective for failing to introduce messages in which the victim allegedly said that Appellant did not sexually assault her. Appellant's Brief at 30-44. Therefore, Appellant concludes that the PCRA court erred in dismissing his PCRA petition and asserts that this

_____

denied Appellant's petition for allowance of appeal on April 30, 2019, when the time to file a petition for *certiorari* in the United States Supreme Court expired. **See** 42 Pa.C.S. § 9545(b)(3); **see also** U.S. Sup. Ct. Rule 13. As such, the instant PCRA petition, filed on October 19, 2019, was timely filed.

Court should reverse the PCRA court's order, vacate Appellant's judgment of sentence, and remand this case for a new trial. ***See id.*** at 45.

The Commonwealth responds that although there may have been messages in which the victim told Appellant "u never assaulted me," the messages were consistent with the victim merely saying what Appellant wanted her to say. Commonwealth's Brief at 8-9. Further, the Commonwealth asserts that trial counsel had a reasonable basis for declining to introduce the messages, as they were unequivocally inculpatory and prejudicial, and prove that, at a minimum, Appellant physically attacked and beat the victim. ***See id.*** at 9. Further, the Commonwealth argues that if trial counsel had attempted to introduce a version of the messages with the inculpatory information redacted, the Commonwealth could have introduced the entire message under Pa.R.E. 106.[4] ***See id.***

Our review of the denial of PCRA relief is limited to "whether the record supports the PCRA court's determination and whether the PCRA court's decision is free of legal error." ***Commonwealth v. Lawson***, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." ***Commonwealth v. Mitchell***, 105 A.3d 1257, 1265 (Pa. 2014)

---

[4] The Rule provides: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time." Pa.R.E. 106.

(citation omitted); *see also Commonwealth v. Davis*, 262 A.3d 589, 595

(Pa. Super. 2021) (stating that "[t]his Court grants great deference to the

findings of the PCRA court if the record contains any support for those

findings." (citation omitted)).

> [T]o establish a claim of ineffective assistance of counsel, a defendant must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place. The burden is on the defendant to prove all three of the following prongs: (1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different.
>
> We have explained that a claim has arguable merit where the factual averments, if accurate, could establish cause for relief. Whether the facts rise to the level of arguable merit is a legal determination.
>
> The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.
>
> Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
>
> . . . Moreover, a failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness.

*Commonwealth v. Sandusky*, 203 A.3d 1033, 1043-44 (Pa. Super. 2019) (citations omitted and formatting altered).

The PCRA court addressed Appellant's claim of ineffectiveness and concluded that trial counsel had a reasonable basis for deciding not to introduce the messages:

> [Trial counsel] testified that he received a copy of the [messages] from Appellant either before or at the outset of the trial. [Trial counsel] also stated that he and Appellant mutually agreed that the Facebook conversation would not be beneficial and that they should not use it as a trial exhibit. [Trial counsel] explained his first rationale for not using the Facebook conversation at trial as follows:
>
> > I believe, first and foremost, was the fact that the transcript had [Appellant] admitting to assaulting the victim in this case. And we did not think that would paint him in the light that we wanted the jury to see him in for the trial. [Appellant and I] had several conversations about that, and he understood that implicitly.
>
> The Facebook conversation between Appellant and [the victim] did contain exchanges which were highly prejudicial to Appellant. Appellant told [the victim] that she needed to "tell the truth for Daddy" and say nothing happened. In response, [the victim] asked Appellant, "can u tell me why u did that to me u really hurt me." [The victim] then told Appellant, "[A]ll I ever tried to do is be a gf to you but u just kept wanting to beat on me like I was ur worst fuckin enemy." [The victim] later stated, "[You] fucked my face up gave me a bloodclot n a concussion." [The victim] also told Appellant that she wasn't going to sell herself and asked, "why [I] messed my reputation up for u when u want to beat me up put ur hands on me everyday n cheat on me dead in my face."
>
> \* \* \*
>
> Additionally, [trial counsel] testified that his defense strategy was focused on more than just the rape charge and that he was "operating and defending the case at my client's direction with the narrative that he did not commit any of these acts that she was alleging he committed." Finally, [trial counsel] testified that he

- 9 -

did not order Appellant not to testify but that he may have advised him not to.

This court thus found the testimony of Appellant's trial counsel . . . to be credible and concluded that he had an objectively reasonable basis to not introduce the Facebook conversation at Appellant's trial. [Trial counsel] testified that while the Facebook messages may have been beneficial in casting doubt on the [the victim's] testimony regarding the sexual assault, [the messages] would have opened the door to other information about Appellant that would not have been beneficial for the jury to hear. The information that would have been revealed, namely the physical assault and history of prostitution, directly contradicted the narrative [trial counsel] presented to the jury.

Appellant's mother, Gloria Ford, testified that [the victim's] injuries were caused by an accidental fall and not by Appellant. [Trial counsel's] strategy at Appellant's trial was thus reasonably designed to provide a complete defense to all charges instead of using the Facebook conversation to effectively concede the charges of aggravated assault and terroristic threats in the hopes of providing a stronger defense against the charges of rape and sexual Assault. [Trial counsel's] decision to not introduce the Facebook conversation was therefore made to best effectuate his client's interests.

PCRA Ct. Op., 3/20/24, at 9-11 (formatting altered and citations omitted).

After review, we agree with the PCRA court's conclusions, which are supported by the record and free from legal error. *See Lawson*, 90 A.3d at 4. Appellant failed to demonstrate that trial counsel lacked any reasonable strategic basis for declining to introduce the messages. *See Commonwealth v. Roney*, 79 A.3d 595, 604 (Pa. 2013) (reiterating that "we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had **any** reasonable basis" (citation omitted and emphasis added)). Therefore,

Appellant's claim fails. **See Sandusky**, 203 A.3d at 1043-44. On this record, we affirm.

Order affirmed. Jurisdiction relinquished.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/14/2024